Dtjkfee, Judge,
delivered the opinion of the court:
These two actions have been joined because of the similarity of issues. At one time or another during the six years preceding the filing of these suits, each of the 47 plaintiffs was employed as a meat inspector in the Meat Inspection Branch, Agricultural Eesearch Service (formerly the Bureau of Animal Industry, and hereinafter called the “Service”), Department of Agriculture. The claims are for night differential pay under section 301 of the Federal Employees Pay Act of 1945, as amended, 59 Stat. 295, 298 and the 1954 Act amending that section, found at 68 Stat. 1110, for hours worked between 6 p.m. and 6 a.m. while in an overtime status.
Plaintiffs worked at various stations throughout the country but the proof at trial was restricted to the situation as it existed in the New York City area which the parties have agreed is representative of plaintiffs’ working conditions everywhere. The Meat Inspection Act of 1906,34 Stat. 674, as amended and implemented by regulations requires federal inspection of every plant which slaughters or processes meat for shipment in interstate commerce. The meat inspectors employed by the Service are assigned to each plant or establishment for the supervision of all operations connected with meat processing and no plant may operate without an inspector on the premises to supervise operations. The inspectors are required to be present throughout the entire *3 period during which the plant is operating and to remain at the plant to which assigned until the processing is completed or until relieved.
In general, plaintiff inspectors’ duties consist of overseeing the meat processing and supervising the sanitation of plant facilities, equipment, and personnel throughout the various meat preparation steps which include curing, cutting, blending, and packaging. The brands and inspection stamps which show that the meats are Government approved are within the jurisdiction and custody of the inspectors.
Of approximately 75 establishments operating in the New York City area at the time of trial, 10 were engaged in slaughtering. The balance were processing plants, and of these plants, 10 or 12 were on a 24 hour, or an around the clock, schedule of operations. Inspectors are assigned to the 24 hour plants in two shifts, viz, from 7 a.m. to 7 p.m. and from 7 p.m. to 7 a.m. Habitually, that is on most of the days of operation, the plants not on a 24 hour basis operate for more than eight hours. From time to time hours are worked at these plants after 6 p.m. Overtime is worked in the slaughtering plants on about 50 percent of the days on which they operate.
Permission for an establishment to utilize inspection services for more than eight hours in any one day must be obtained. Written requests to operate overtime with inspectors’ services must be filed with the Meat Inspection Branch. At the time of trial, every establishment in the New York City area had filed such a request. The finishing or closing time of the processing plants, and hence the number of overtime hours worked, is controlled by the establishments themselves, and not by the plaintiffs or the Government. The defendant is reimbursed by the processing establishments for the overtime services required of meat inspectors in those plants.
Meat inspectors are rotated from assignments in processing plants every six months and from slaughtering plant assignments every two months. Since there are more than five times as many processing plants as slaughtering plants and since the normal assignment at processing plants is three times as long as the slaughtering assignment, by far the *4 major portion of the plaintiffs’ total working time over the long run is spent at processing plants. Plaintiffs occasionally work at import stations or at clerical duties but these types of work occupy such a small percentage of plaintiffs’ overall working time that they are negligible for our present considerations.
Plaintiffs have received overtime pay for all hours worked in excess of eight each working day. They have received night differential pay for hours worked after 6 p.m. which were a part of the first eight hours of work that day but not for any overtime hours worked between 6 p.m. and 6 a.m.
Since the enactment of the Federal Employees Pay Act of 1945, no night differential during overtime hours has been paid except during 1946. The payments were authorized that year by a directive of the then Meat Inspection Division and were canceled the following year by another directive. In 1953, plaintiffs sought to obtain payment of night differential through the office of their union representative, although other efforts in that direction had been made as early as 1950. The administrative chief of the Service advised an official of the Meat Inspection Division that, in his opinion, the night differential could not be paid because the night overtime was not a part of a “regularly scheduled tour of duty,” which he interpreted to be a statutory prerequisite for payment of night differential. This opinion was passed on to plaintiffs’ representative with the comment that the Division considered it impractical to include any overtime in a “regularly scheduled tour of duty.”
The same directive which put a stop to the 1946 practice of paying a differential for night overtime hours also set the tour of duty for meat inspectors at a 40 hour week composed of five eight hour days. Circ. Letter 2959; Chief, Bureau of Animal Industry; June 20,1947.
Before addressing ourselves to the question of the Government’s liability or lack thereof, we must discuss the defense of laches. It is claimed that the plaintiffs are guilty of laches for although the compensation practices of which they complain have been in effect since 1947, they made no attempt to obtain corrective action until 1953 and did not institute *5 suit until 1956. The defendant maintains that all this operated to its prejudice.
It is well settled that the equitable doctrine of laches ordinarily has only limited application in a suit at law governed by a statute of limitations. Prejudice to the defendant, as well as a lack of diligence by plaintiff, must exist before a lapse of time will constitute laches. Eegarding the defense of laches in suits which have been filed within the statutory period of limitations, this court has recently said in Obrien v. United States, 148 Ct. Cl. 1, 4:
It is only where some great injustice would be done the defendant by so long a delay by the claimant that the doctrine of laches should be set up to defeat consideration of the claim on the merits. The equities on both sides should be carefully weighed, and it should be clear that they weigh heavily on the side of the defendant before the court refuses to hear a case because of a delay of less than the statutory period.
The prejudice assigned by the Government to the claimed delay is that if it should be required to make additional payments to plaintiffs as a result of this suit, it may no longer have any legal right to demand reimbursement from the processing establishments. We do not feel that a possible prejudice of this nature is sufficient for us to invoke the doctrine of laches especially in view of the evidence that attempts to obtain night differential payments were made as far back as 1950 and that suit was instituted as soon as enough plaintiffs were found to join together to make the action financially feasible.
Plaintiffs’ claim for additional pay is based on section 301 of the Federal Employees Pay Act of 1945, supra, for the period prior to September 1954 and on the 1954 amendment to the Act, 68 Stat. 1110 for the time subsequent thereto. This legislation is now codified at 5 U.S.C. 921. The parties have agreed that the 1954 amendment did not work any substantial change in the meaning and effect of the statute and that a decision on the question of defendant’s liability under the original enactment will be controlling for the period after the amendment.
*6 Section 301 as originally enacted on June 30, 1945, provides:
Any officer or employee to whom this subchapter applies who is assigned to a regularly scheduled tour of duty, any part of which, including overtime, falls between the hours of 6 o’clock postmeridian and 6 o’clock antemeridian, shall, for duty between such hours, excluding periods when he is in a leave status, be paid compensation at a rate 10 per centum in excess of his rate of basic compensation for duty between other hours: Provided, That such differential for night duty shall not be included in computing any overtime compensation to which the officer or employee may be entitled: Arid, provided further, That this section shall not operate to modify the provisions of the Act of July 1,1944 (Public Law Numbered 394, Seventy-eighth Congress), or any other law authorizing additional compensation for night work.
The 1954 amendment provides:
Any regularly scheduled work between the hours of six o’clock postmeridian and six o’clock antemeridian (including periods of absence with pay during such hours due to holidays, and any such hours within periods of leave with pay if such periods total less than eight hours during any pay period) shall be considered night-work, except as provided in subsection (b), and any officer or employee performing such work to whom this title applies shall be compensated for such work at his rate of basic compensation plus premium compensation amounting to 10 per centum of such rate, unless otherwise provided in title IV of this Act. This section shall not operate to modify the provisions of the Act of July 1, 1944 (Public Law Numbered 394, Seventy-eighth Congress), or any other law authorizing additional compensation for nightwork.
Other sections of the Federal Employees Pay Act of 1945 set the basic workweek of federal employees at five days of eight hours each and require the Civil Service Commission to promulgate the necessary implementing regulations which it has done. The Department of Agriculture has also adopted implementing regulations from time to time, which consistently use the term “regularly scheduled” referring to night differential pay for overtime hours.
If plaintiffs were assigned to regularly scheduled tours *7 of duty and if these tours of duty included overtime hours of work, then any overtime hours which might have been worked after 6 p.m. and before 6 a.m. should have been paid for at the night differential rate. The Government has declined to honor any such claims on the ground that the overtime, and hence the night hours, was not a part of a regularly scheduled tour of duty.
A basic workweek of 40 hours, composed of five eight hour days has been established for plaintiffs. Longer workweeks with overtime pay can, of course, also be scheduled. The hours in excess of 40 worked each week which are included in a regularly scheduled workweek are known as regular overtime. Administrative Regulations of the Department of Agriculture. Title 7, chapter 3, sections 298(b) and 298(d); Circ. Letter 2959, supra. The departmental regulations contain the following definition at Title 8, chapter 7, section 180(c):
Regularly scheduled administrative workweek or regularly scheduled tour of duty for full-time employees means the period within an administrative workweek when such employees are required to be on duty regularly. For employees other than full-time, it means any regularly scheduled work period to which they may be assigned. The regulations contained in chapter 8 of this title prescribe the method of establishing such periods for full-time employees.
The immediate impression to be gained from the foregoing is that the overtime and night hours worked by plaintiffs were not a part of regularly scheduled tours of duty simply because the Service scheduled a 40 hour, five day week only and on no occasion formally scheduled any overtime. If this is the case, clearly the defendant’s contention must be upheld. But, as a factual matter, is it true that there was no overtime work required as a part of plaintiffs’ regularly scheduled tours of duty ?
Notwithstanding the fact that plaintiffs were scheduled to work only five days a week, eight hours a day, overtime was habitually worked at the processing plants. This fact was well known to the defendant when it scheduled in advance the tours of duty. Although the defendant notes that the hours of overtime were in the discretion and control of the *8 processing plants, it is a fact that departmental regulations required the plaintiffs to remain on the premises as long as the processing continued. Furthermore, no processing plant could operate with the inspectors’ services for more than eight hours a day without the permission of the defendant and this permission had apparently been granted to all of the processing establishments. As a matter of fact, the regularly scheduled tour of duty went beyond the “basic workweek” and the “regularly scheduled workweek” described in the statutes and regulations because it was understood and anticipated that overtime would be regularly worked. The tours of duty worked by plaintiffs really constituted the regularly scheduled administrative workweeks or tours of duty defined in the departmental regulations because the tours actually worked were the “period [s] * * * when such employees [were] required to be on duty regularly.” The plaintiffs had no choice but to work the overtime and they were required to be on duty regularly during the overtime periods.
In actuality, the tours of duty which the defendant regularly scheduled for the plaintiffs were not 40 hour, five day weeks but weeks consisting of five days each, each day lasting for eight hours or vmtil the processing plant completed its reewrring overtime. The defendant could have formally scheduled workweeks or tours of duty which included the overtime which it knew would be required. It declined to do so because it feared that payment might have to be made for overtime hours scheduled but not actually worked in the event that the plants had unexpectedly changed their plans and not required overtime services.
However, it seems inequitable and unfair to us for the Government to hold that plaintiffs have not regularly worked the overtime which they were expected to work simply because it chose to adhere to guide lines which have no bearing on the realities of the situation. The mere fact of omitting regular overtime from the scheduled tours of duty does not make such overtime occasional or irregular. Nor does the fact that assignments to processing establishments may be changed after a period of months detract from the regularity of the work performed under such assignments. Regularity does not require a similar program for an in *9 definite time; it is enough if a certain course of events continues for a period of time sufficiently long enough for the individual to say that it is his usual or customary employment. A regular schedule making plaintiffs perform only so much overtime as the processors might require each day would effectively preclude any possible danger of the Government’s having to pay for overtime hours not actually worked.
Our understanding of section 301 of the Federal Employees Pay Act of 1945 is that if overtime is regularly scheduled any part of that overtime occurring after 6 p.m. must be compensated for at the night differential rate. If such compensation must be paid plaintiffs for the night hours worked in the plants which do not operate on 24 hour schedules, a fortiori, this result must apply to the night hours worked in the 24 hour plants. The practice has been that night differential is paid for the first eight hours of the night shift and overtime for those hours beyond eight even though they may occur before 6 a.m. We see no justification for this practice in view of the explicit language of the statute which directs differential payment for regularly scheduled hours, including overtime, between 6 p.m. and 6 a.m. We know of no statutory prohibition against the payment of both overtime and night differential for the same hours as long as they are computed as separate premium items.
Having decided that the overtime worked by plaintiffs was part of regularly scheduled tours of duty, we hold that plaintiffs should be paid the night differential for any overtime hours worked in processing plants between 6 p.m. and 6 a.m. Judgments will be entered to that effect, and the amount of recovery of each plaintiff will be determined pursuant to Rule 38(c).
It is so ordered.