Ossie BENNETT, et al.

v.

The UNITED STATES.

No. 565–78C.

United States Claims Court.

Jan. 20, 1984.

Harry Toussaint Alexander, Washington, D.C., attorney of record, for plaintiffs.

Robert A. Reutershan, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

MEMORANDUM OF DECISION

HARKINS, Judge.

This case was filed in the United States Court of Claims on December 29, 1978, and, after trial on liability issues, was remanded on September 30, 1982, to the Trial Division for further proceedings. The September 30, 1982, order adopted per curiam the recommendation set forth in the trial judge's August 4, 1982, opinion as the basis for its judgment on liability.

This case is concerned with claims by Deputy United States Marshals in the District of Columbia Office that, during the period December 30, 1972, through December 29, 1978, they should have been paid premium pay at regularly scheduled overtime (RSOT) rates rather than at administratively uncontrollable overtime (AUO) rates. The trial judge's opinion concluded that inclusion of deputy marshals in the list of Department of Justice positions eligible for AUO premium pay was valid and authorized by statutory and regulatory criteria. The trial judge applied the test recommended by the Department of Justice and the Office of Personnel Management, which had been approved by the Court of Claims in *Anderson v. United States*, 201 Ct.Cl. 660 (1973), that regularly scheduled overtime is overtime that is regularly prescribed according to statutes and regulation. The term "regularly scheduled overtime" under this test means overtime hours duly authorized for an individual employee prior to the beginning of the administrative work week as part of the employee's regularly scheduled administrative work week.

Plaintiffs' backpay claims were denied for failure to satisfy the *Anderson* test. The opinion found, however, that during the period between December 30, 1972, and October 18, 1976, some deputy marshals may have logged as AUO in certain categories of duty some overtime hours that should have been scheduled in advance to an individual deputy marshal. The case was remanded for further proceedings to permit plaintiffs to establish entitlement on an individual basis to the RSOT rate for

some overtime hours worked during that period.

The case was transferred to the United States Claims Court on October 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[1] On November 22, 1982, counsel were directed to attempt to negotiate a settlement of any claims of individual plaintiffs, and, in the event settlement discussions were unproductive, to file on December 10, 1982, a joint recommendation for further proceedings. Counsel were unable to negotiate a settlement; the joint recommendation, timely filed, requested a 60 day period for additional discovery and provided for production of documents. Plaintiffs agreed in the joint recommendation to provide information in the following format:

3. Third, plaintiffs will, after such records as can be retrieved have been examined, furnish defendant with a statement under penalty of perjury, from each remaining plaintiff specifying: (1) the nature of the duties they performed which they contend meet the criteria for RSOT pay set by Judge Harkins' Opinion (*i.e.*, overtime work during the December, 1972—October, 1976 period which should have been regularly scheduled) and (2) the specific days on which they performed such work. Each statement shall contain the reason the plaintiff contends each type of duty should have been regularly scheduled under the criteria set out in Judge Harkins' Opinion. Any hours of overtime claimed shall be set out in the format of plaintiffs' exhibit 12—the chart listing the activity requiring overtime, the number of hours worked, and the date on which overtime was worked for each deputy.

By March 8, 1983, discovery had not been completed, plaintiffs had not submitted individual claims to defendant, and counsel had not requested a pretrial conference. On that date, counsel were directed to complete those actions on or before April 1, 1983. On April 1, 1983, plaintiffs by motion requested additional time to complete discovery; defendant opposed this motion on the ground that plaintiffs had failed to attend scheduled meetings and had not examined files made available in accordance with the joint recommendation. Plaintiffs' motion for additional time was denied on April 27, 1983, and a conference was scheduled for June 7, 1983. The conference memorandum and order contained the following paragraphs:

1. Counsel were told that the conference had been called to explore reasons for the failure of the proceedings outlined in the December 10, 1982, joint recommendation. Plaintiffs' counsel acknowledged that there had been a failure to attend meetings scheduled by defendant as described in defendant's April 6, 1982, opposition to plaintiffs' motion for enlargement of time. Plaintiffs' counsel was advised that it would not be inappropriate to dismiss the case at this time for lack of diligence and failure to prosecute.

\* \* \* \* \* \*

3. The following schedule was established:

A. Defendant shall have 20 days to assemble daily logs, and any other relevant records, applicable to plaintiffs during the specified period. On or before 20 days from the date of this order, defendant shall file a notice that the records have been assembled and are ready for inspection at a designated location.

B. Plaintiffs shall examine the records at the location designated. On or before 30 days after the date of defendant's notice of availability, plaintiffs shall file a statement that sets forth the claims of specific individuals that properly should have been scheduled as RSOT under the *Aviles* test.

C. Defendant's response shall be filed 30 days thereafter.

D. Plaintiffs' reply shall be filed 15 days after defendant's response.

Defendant's notice that the records had been assembled and were available for in-

---

1. 28 U.S.C. § 171 note (1983).

spection was filed on June 28, 1983. Plaintiffs' statement of claims was filed on August 1, 1983; and defendant's response was filed on August 31, 1983. On September 15, 1983, plaintiffs filed a reply to defendant's response and an amended statement of claims. By order on September 16, 1983, defendant was given leave to respond to the plaintiffs' amended statement of claims on or before September 29, 1983. Defendant's response was timely filed on that date.

On August 31, 1983, defendant filed a motion to dismiss for failure to prosecute or, alternatively, because the information contained in plaintiffs' August 1, 1983, statement of claims was incomplete and so meager as to be totally inadequate to establish any entitlement to relief. Plaintiffs filed on September 15, 1983, an opposition to the motion to dismiss, and defendant replied on September 29, 1983.

Plaintiffs' August 1, 1983, statement of claims did not comply with the August 4, 1982, opinion or the June 8, 1983, order. Plaintiffs' statement did not establish (1) what days were claimed to have been worked, (2) what category of work was claimed to be compensable at RSOT rates, or (3) why such work should have been regularly scheduled. In addition, the statement contained gross arithmetical errors that tended to inflate the claims, and no effort was made to adjust the claims to account for and compensate for AUO premium pay already received for the hours involved.

Plaintiffs' September 5, 1983, amended statement of claims has no basis on the record of this case and reflects a lack of comprehension of the decision on the merits of the liability issues. The amended claims apparently seek to have every hour of AUO converted to hours eligible for RSOT rates. The claims do not identify what AUO hours by date worked should have been scheduled as RSOT hours, and do not explain why any

of the hours should have been regularly scheduled. In addition, the amended claims, with no explanation, increased substantially the number of hours for which RSOT was claimed over the number of hours claimed in the initial statements of claims.

Defendant has made the daily logs, and other records relevant to a statement of plaintiffs' claims available for inspection, including the Official Personnel Folders (OPF) for each plaintiff. Plaintiffs have all the pay data necessary to make a reasoned statement of their claims. This they have failed to do.

It is appropriate at this time to dismiss this action on the merits for plaintiffs' failure to make a legally adequate showing of entitlement to any damages. In order that basis for this judgment is placed in context and is complete, the August 4, 1982, opinion of the Trial Judge of the United States Court of Claims is attached to and made a part of this memorandum. The separate detailed findings of fact, which have been provided to the parties, are not included.

The complaint is to be dismissed.

## APPENDIX

### IN THE UNITED STATES COURT OF CLAIMS TRIAL DIVISION

No. 565–78

(Filed August 4, 1982)

### OPINION *

HARKINS, *Trial Judge:* Plaintiffs are 14 Deputy United States Marshals [1] who were employed during the period December 30, 1972, to December 29, 1978, in the District of Columbia office of the United States Marshals Service (USMS), a bureau of the Department of Justice. Most of the overtime hours worked by plaintiffs in the relevant period were compensated by the type

---

* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

1. The petition listed 20 plaintiffs; six were dismissed during the trial when it appeared they had not been employed in the District of Columbia office; five were dismissed voluntarily, and one involuntarily by order of the trial judge.

of premium pay known as administratively uncontrollable overtime (AUO) pursuant to 5 U.S.C. § 5545(c)(2) (1976).[2] Plaintiffs claim they should have been paid for overtime at the time and one-half rate applicable to regularly scheduled overtime (RSOT) pursuant to 5 U.S.C. § 5542 (1976).[3]

## I.

In 1966, this court determined that the duties performed by Deputy U.S. Marshals qualified for premium pay pursuant to the AUO statute. *Burich* was concerned with a claim for backpay by a deputy marshal in the San Diego, California office, whose duties were described generally to "encompass a variety of activities which range from the transportation of prisoners and the serving of process to the execution of writs and attendance at court."[4] *Burich* arose on cross-motions for summary judgment, with all facts stipulated. It turned on the meaning of the term "regularly scheduled overtime." Plaintiff claimed that his assignments were made on a daily basis, and any overtime that was required

necessarily was regularly scheduled. The court noted that AUO and RSOT were mutually exclusive methods for allowing premium compensation with respect to two distinct kinds of overtime work. AUO was developed to provide compensation to employees in a position that requires irregular, unscheduled overtime duty. Although the deputy marshal's assignments were made on a daily basis, neither the nature of the work nor the length of time required for its performance could be ascertained beforehand. The deputy marshal "was not assigned overtime, he was assigned a task which *might* require overtime."[5] To the extent the work involved overtime, such overtime perhaps could be anticipated, but it could not be regulated. Under such circumstances, the deputy marshal's additional duty hours were held to represent AUO rather than RSOT.

In the normal course, a prior ruling of this court directly in point and involving the same personnel classification should dispose of plaintiffs' backpay claims in this case. *Burich* states the law and is binding in this

---

**2.** 5 U.S.C. § 5545(c)(2) (1976) provides:

"(c) The head of an agency, with the approval of the Civil Service Commission, may provide that—

\* \* \* \* \* \*

"(2) an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled, overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require him to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is determined as an appropriate percentage, not less than 10 per centum nor more than 25 per centum, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10, by taking into consideration the frequency and duration of irregular unscheduled overtime duty required in the position."

**3.** 5 U.S.C. § 5542 (1976) provides:

"(a) For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an admin-

istrative workweek, or (with the exception of an employee engaged in professional or technical engineering or scientific activities for whom the first 40 hours of duty in an administrative workweek is the basic workweek and an employee whose basic pay exceeds the minimum rate for GS–10 for whom the first 40 hours of duty in an administrative workweek is the basic workweek) in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for, except as otherwise provided by this subchapter, at the following rates:

"(1) For an employee whose basic pay is at a rate which does not exceed the minimum rate of basic pay for GS–10, the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of basic pay of the employee, and all that amount is premium pay.

"(2) For an employee whose basic pay is at a rate which exceeds the minimum rate of basic pay for GS–10, the overtime hourly rate of pay is an amount equal to one and one-half times the hourly rate of the minimum rate of basic pay for GS–10, and all that amount is premium pay."

**4.** *Burich v. United States,* 177 Ct.Cl. 139, 142, 366 F.2d 984, 986 (1966), *cert. denied,* 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182 (1967).

**5.** *Id.* at 145, 366 F.2d at 988.

court until overturned *en banc.* Reexamination of the AUO system to compensate Deputy U.S. Marshals for overtime hours, however, is warranted by events that have occurred since 1966.[6]

In 1976, the district court in *Fox,*[7] a class action tried on its merits, ruled that the USMS should have paid Deputy U.S. Marshals in the Eastern District of Virginia at the RSOT rate for overtime occasioned by the serving of writs, summonses and other papers and by prisoner coordination trips. The court considered it clearly erroneous under the statute and regulations to apply AUO when the duties involved could be controlled administratively by hiring additional personnel. The court found that prisoner coordination trips and the service of writs, summonses and other papers, on the facts shown by plaintiffs, required overtime because the performance of other duties made it virtually impossible to complete these tasks during regular work hours. Work after 5 p.m. or on weekends in that district for these duties, the court reasoned, did not result from the nature of the job, but from a shortage of manpower.

On June 19, 1980, in *Bilotti v. United States,*[8] Trial Judge Schwartz filed an opinion in this court that analyzed duties performed by Deputy U.S. Marshals employed in the Southern, Eastern, and Western Districts of New York. He concluded that a number of types of work in those districts should have been paid at the RSOT rate

because the overtime could have been controlled administratively by regular scheduled overtime or by shift rescheduling. The *Bilotti* case has been dismissed, after the parties stipulated amounts to be paid each plaintiff, without a ruling by the court on the trial judge's analysis and recommended disposition. In addition to *Fox* and *Bilotti,* by 1978, more than 20 lawsuits had been filed by various groups of Deputy U.S. Marshals seeking damages for alleged improper use of the AUO system.

During the 1970's, the AUO system of premium overtime pay also became an issue in negotiations for a national contract between the USMS and the American Federation of Government Employees, International Council of Deputy Marshal Locals. Effective August 16, 1976, the negotiated national contract provided a definition for overtime related to schedules for the administrative workweek, and established criteria for payment of time and one-half for overtime work scheduled in advance of an assignment to recur on 2 or more successive days or after 2 or more intervals of days specified in the schedule.

On June 7, 1978, the USMS offered to extend the terms of a settlement, which had been negotiated to dispose of the *Fox* case, to all former and present Deputy U.S. Marshals.[9] Plaintiffs refused the USMS settlement offer and filed their petition on December 29, 1978.[10]

**6.** *Mississippi River Fuel Corp. v. United States,* 161 Ct.Cl. 237, 246–57, 314 F.2d 953, 958 (1963) (Davis, J. concurring).

**7.** *Fox v. United States,* 416 F.Supp. 593 (E.D. Va.1976).

**8.** *Bilotti v. United States,* Ct.Cl. Nos. 452–72, 25–74 and 350–74, (opinion of trial judge, filed June 19, 1980); dismissed as to all plaintiffs except one (plaintiff No. 29 in Ct.Cl. No. 452–72) on stipulation for entry of judgment filed Aug. 14, 1981.

**9.** The *Fox* case was terminated on Apr. 8, 1977, on a stipulation of settlement, with judgment for plaintiffs in stipulated amounts. The monetary settlement provided that 35.4 percent of the overtime hours worked in the Eastern District of Virginia would be compensated at time

and one-half. The settlement offered on June 7, 1978, to the other deputy marshals was calculated by taking 35.4 percent of the AUO overtime earned during the period Dec. 12, 1971, through May 6, 1978, and converting that percentage to time and one-half, less the amount of AUO already received for that overtime. For each present and former Deputy U.S. Marshal, the USMS provided a computer printout that indicated the amounts earned as AUO during the applicable period, and a calculated amount offered in settlement of past overtime claims for the period.

**10.** The June 7, 1978, settlement letters to plaintiffs were admitted as evidence over defendant's objections. Plaintiffs had no claims pending in court on June 7, 1978, and the letter was not a compromise or offer to compromise claims in litigation under Fed.R.Evid. 408. The

More important, perhaps, than the litigation related to other USMS districts, reexamination of *Burich* is in order with respect to backpay claims of deputy marshals in the D.C. office because of factual differences that make that office unique in the USMS. Moreover, during the 1970's D.C. office operations were exceptionally noteworthy because of turmoil and controversy concerning maladministration of the deputy marshal's work, and part of the controversy was related to unfair use of the AUO system of premium pay.

On November 4, 1974, Raymond Miller and Wallace Roney, plaintiffs in this case, brought an action against the Attorney General and other officials of the Department of Justice alleging discriminatory promotion practices and other forms of harassment and racial discrimination. In February 1976, the parties reached an Agreement of Compromise, and the action was dismissed on February 23, 1976. The compromise provided for the creation of an intradepartmental panel in the Department of Justice to study the operations of the D.C. office, including promotion and assignment practices. This panel, chaired by Peter R. Taft, Assistant Attorney General, Land and Natural Resources Division, submitted its report (the Taft Report) on January 3, 1977. The Taft Report describes working conditions in the D.C. Marshal's office that are associated with plaintiffs' backpay claims, and which complicated the trial and disposition of those claims.

The jurisdiction and the size of the D.C. office creates problems that are different from those of other USMS district offices. In addition to services for the District Court, the D.C. office also must provide marshal services for the Superior Court system. This local jurisdiction means that deputy marshals in the D.C. office perform duties that normally would be performed by a sheriff's department in a county jurisdiction. Some of its law enforcement functions, such as evictions, domestic cases and local crime, are not normally handled in other districts. As a consequence, the D.C. office is the largest district office, and many more judges, magistrates and assistant district attorneys must be accommodated than in any other USMS district. The Taft Report concluded that federal court duties of the D.C. office could have been performed with approximately ⅓ of the present manpower.

There were 1,682 deputy marshals in the 94 USMS districts as of June 30, 1976; the D.C. office, with 180 regular and 30 irregular (part-time) deputy marshals, at that time had more than 10 percent of the national contingent. Operations in the D.C. office, in addition, were complicated by dissension about racial discrimination. There were 230 (14 percent) black deputy marshals in the USMS, and 114 were assigned to the D.C. office.

Plaintiffs contend that the D.C. office was understaffed during the relevant period. The D.C. office, however, in comparison with other district offices was staffed fairly and equitably in terms of workload statistics and budgetary limitations. Deputy marshals were available for assignment to the various organizational sections it used to perform marshal's duties.

Inefficient supervision and poor management practices, however, were found to have contributed to dissension in the D.C. office and to the grievances of the deputy marshals. Many of the deputies' complaints were corrected or alleviated by means of agreements between the USMS and the deputy marshals union.

Historically, there had been very little job rotation in the D.C. office. Deputy marshals assigned to district judges often remained with the judge for years; assignment to cellblock duties in the Superior Court relegated the deputies to protracted undesirable work in antiquated and inade-

computer printout purported to be an accurate calculation by the USMS of the amount of AUO earned by the plaintiffs during the December 1971—May 1978 period, and was an admission that substantial amounts of overtime hours eligible for AUO had been approved. Statistical data relative to plaintiffs' AUO hours worked and claimed were matters that counsel could not stipulate during pretrial, and are in vigorous dispute.

quate facilities. Selection for the more attractive job assignments allegedly was based upon favoritism and racial discrimination. On November 13, 1975, a formal job rotation policy was agreed upon with the union. For job assignment purposes, the D.C. office was divided into four sections—cellblocks, courtroom support, general assignment, and warrants. Initially, deputies were rotated every 90 days; effective December 6, 1977, after further negotiations with the union the rotation period was extended to 1 year.

Prior to 1975, the D.C. office did not have a separate procedure for rotation of assignments for prisoner transportation and coordination trips (PC) and for special assignments. PC and special assignments were desirable duties because they guaranteed overtime pay at RSOT rates. More desirable PC assignments could be "skimmed off" by supervisory personnel, and there was favoritism in the award of this preferred duty. Some deputies had not received a special assignment for several years. On October 17, 1975, based on an agreement with the union, a system was put into effect in which PC assignments and special assignments (including the Superior Court Saturday detail and lineup night) were put on rosters, with the individual deputy marshals listed in alphabetical order. Thereafter assignments were made on an alphabetical rotation. Once a deputy marshal was selected for a special assignment, there was a guaranteed minimum of 44 hours of RSOT. Initially, there was a guaranteed minimum of 26 hours of RSOT for deputy marshals assigned to Superior Court Saturday detail and lineup night. This 26-hour minimum later proved impracticable because the lineup night required only 2–3 hours overtime instead of the former 5 hours. Because of this, the 26-hour minimum guarantee for Superior Court detail and lineup night was overlooked and later abandoned.

The Taft Report concluded that charges of racial discrimination against the black deputy marshals had been established and that charges of harassment and retaliation because of efforts to enforce equal opportunity and nondiscrimination in federal employment had been sustained. When the Taft Report was published on January 3, 1977, deficiencies in management, supervision, and training were found to continue to be contributing factors to the low morale and grievances about conditions in the D.C. office.

II.

Deputy marshals had been placed under the AUO system in 1955, and thereafter AUO was the primary method of premium pay for substantial amounts of irregular, unscheduled overtime duty. Until 1976, only a small percentage of overtime worked by Deputy U.S. Marshals was eligible for RSOT compensation. Assignments to the duties that were eligible for the available RSOT allegedly were based upon favoritism and racial discrimination. In 1975, when the system for assignment of these duties by roster was introduced, most of these types of complaints were eliminated. Rosters distributed the assignments where RSOT was available more equitably; they did not, on the other hand, determine whether overtime would be worked.

Throughout the period, in the USMS and in the D.C. office, there were complaints that the use of the AUO system was improper for the types of duties performed by Deputy U.S. Marshals. Deputy marshals sought to minimize AUO, and to maximize RSOT, because AUO premium pay basically was little more than straight time, while RSOT premium pay was at time and one-half. Other complaints about AUO were that the same percentages of premium pay were added when differing amounts of overtime hours were worked. In the D.C. office, a number of deputy marshals worked more than an average of 10 AUO hours per week. The maximum 25 percent premium payment required an average of over 9 AUO hours per week, and no additional premium payment was made for the surplus overtime hours.

Effective October 21, 1978, AUO was discontinued in the USMS as a form of premi-

um compensation.[11] Plaintiffs' claim, essentially, is that the inclusion of the deputy marshal position in the list of Department of Justice organizations eligible for AUO was invalid under the statutory and regulatory criteria. Plaintiffs divide the duties performed by deputy marshals in the D.C. office into 12 categories, all of which on occasion could require overtime, and assert that all overtime in these categories could have been controlled administratively. Plaintiffs point to subsequent remedial actions by the USMS, in 1975 and 1976 to provide RSOT for overtime work in some categories, and to abolish AUO in 1978 for all categories, as evidence that AUO should not have been used in prior years. The decision to include the position of deputy marshal in the list of Department of Justice organizations eligible for AUO must be upheld, unless (1) it clearly contradicts the terms or purpose of the statute, or (2) it clearly contradicts the implementing regulations of the Civil Service Commission (now Office of Personnel Management).[12]

Prior to 1955, Deputy U.S. Marshals did not receive premium compensation for most of the overtime hours that they were required to work. After World War II, application of a basic 40-hour week, with extra compensation for overtime work in excess of 8 hours a day or 40 hours a week, to federal employees compensated on an annual basis had been a slow and irregular process.[13]

The Federal Employees Pay Act Amendments of 1954 [14] authorized premium pay for irregular, unscheduled overtime, and established a dual system of premium compensation for overtime work. Prior to that time, premium compensation could be paid only for regularly scheduled overtime, holiday work, or as a differential for nighttime work. Federal employees whose overtime mainly was unscheduled, irregular, and occasional were provided a statutory base that permitted the payment of additional compensation. Absent legislation that authorized AUO, any right to premium pay for such work at best would be speculative.[15]

The two systems of premium pay for overtime work are mutually exclusive in that both RSOT pay and AUO pay may not be claimed for the same hours of work. AUO pay is for a distinct form of overtime work that cannot be regularly scheduled or controlled administratively.[16]

All overtime work, both RSOT and AUO, must be officially ordered or approved. Overtime work performed with the knowledge and inducement of supervisory personnel is deemed to be officially ordered or approved. The law will treat as issued those orders that should have been issued.[17] The overtime for which plaintiffs have received compensation, both RSOT and AUO, was officially ordered or approved in the D.C. office.[18]

---

**11.** In the Department of Justice, after Oct. 21, 1978, FBI, DEA, and INS agents continued to be eligible for AUO.

**12.** *Burich v. United States, supra* note 4; *Fix v. United States,* 177 Ct.Cl. 369, 368 F.2d 609 (1966); *Fox v. United States, supra* note 6. For convenience, unless otherwise required by the context, the responsible agency will be referred to as CSC.

**13.** *See generally: Adams v. United States,* 162 Ct.Cl. 767, 771–75 (1963); *Anderson v. United States,* 136 Ct.Cl. 365, 379–86 (1956).

**14.** Pub.L. No. 83–763, § 401, 68 Stat. 1111 (1954) (codified 5 U.S.C. §§ 5541 et seq.).

**15.** *Burich v. United States, supra* note 4, 177 Ct.Cl. at 146, 366 F.2d at 988.

**16.** *Id.* at 145, 366 F.2d at 987.

**17.** *Anderson v. United States,* 201 Ct.Cl. 660 (1973); *Byrnes v. United States,* 163 Ct.Cl. 167, 330 F.2d 986 (1963); *Aviles v. United States,* 151 Ct.Cl. 1 (1960).

**18.** The parties vigorously disagree about the classification of duties and specific hours claimed by plaintiffs as eligible for AUO. For certain years, records are unavailable to support some of plaintiffs' claims; defendant asserts that some AUO hours claimed (notably work during lunch periods) was neither ordered nor approved. Some of plaintiffs' official records (daily logs, time and attendance reports and earning statements) are in the record, and no evidence was produced to establish that they were not completed and approved by the appropriate D.C. office personnel in the normal administrative routines. The USMS June 7, 1978, settlement letter to the respective plaintiffs was an admission that AUO was ordered

The basic difference between the two systems for compensating overtime work was the ability, or lack of ability, to schedule the extra hours. When working conditions permitted the overtime to be regularly scheduled in advance in accordance with CSC regulations, RSOT premium pay—one and one-half times the basic rate of pay, up to the minimum rate of basic pay for GS–10— was provided. AUO, on the other hand, was designed for the purpose of providing compensation to employees "in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled, overtime duty."

AUO was authorized to provide premium pay for irregular and unscheduled overtime performed by investigators of criminal activities, and by employees in other types of positions in which working conditions were comparable in an equivalent degree.[19] The duties of an investigator of criminal activities that exemplified working conditions inherent in a position where the hours cannot be controlled administratively were described in CSC regulations as those where the investigator "is often required to perform such duties as shadowing suspects, working incognito among those under suspicion, searching for evidence, meeting informers, making arrests, and interviewing persons having knowledge of criminal or alleged criminal activities."[20]

In the D.C. office, after 1955 and during the period AUO was used, deputy marshals who had overtime qualified as RSOT were paid in each pay period, when such overtime was worked, for each RSOT overtime hour the rate of pay was equal to one and one-half times their hourly rate of basic pay, up to the minimum rate of basic pay at the

GS–10 level. Inasmuch as deputy marshals are paid on an annual basis, the hourly rate of basic pay was determined by dividing the annual rate by 2,080, and the overtime premium was determined by multiplying the quotient by one and one-half.

Deputy marshals who were eligible for AUO were paid in each pay period a percentage of their annual base salary. Payment of AUO premium pay was made during an "eligibility period." The percentage rate of the premium payment, and eligibility for AUO, was determined in a previous "computation period," principally on the basis of the deputy's record of AUO hours worked during the computation period.[21] The percentage rate was 10, 15, 20, or 25 percent, which was determined by the number of AUO overtime hours the deputy marshal had averaged per week during the computation period (3 to 5 for the minimum 10 percent and over 9 hours for the maximum 25 percent). For a given pay period, the AUO premium supplement was computed by dividing the annual base rate (up to the minimum rate of basic pay at the GS–10 level) by 26 and applying to the quotient the appropriate percentage rate. AUO payments were counted toward a deputy marshal's base pay for retirement purposes; RSOT payments were not so counted.

Until August 1, 1975, when a new deputy marshal had no work record, or when a deputy marshal had worked no overtime during the computation period, or had worked too few hours in a computation period to qualify for AUO pay, a determination of the appropriate percentage rate for use during an eligibility period could be based upon a forecast made by the Marshal, taking into account the number of hours

and approved for the overtime hours represented by the yearly amounts listed.

**19.** S.Rep. No. 1992, 83rd Cong., 2d Sess. (1954), 3 U.S.Code Cong. & Ad.News 3816, 3824 (1954).

**20.** 5 C.F.R. § 550.153(a) (1982).

**21.** From 1972 to Aug. 3, 1975, the eligibility period was 13 consecutive pay periods immediately following a computation period of 13 con-

secutive pay periods. After Aug. 3, 1975, the computation period consisted of the 12-pay period interval ending three-pay periods before the eligibility period for which the determination was made; and the eligibility period consisted of the four-pay period interval beginning three pay periods after the end of the computation period.

reasonably expected to be required in the forthcoming eligibility period.[22]

If during a computation period the deputy marshal did not have a sufficient number of irregular, unscheduled overtime hours to meet the required minimum average of 3 hours per week for the 10 percent minimum AUO rate, such irregular, unscheduled overtime hours were compensated at the rate of time and one-half. During an eligibility period, a deputy received for AUO overtime only the premium payment determined by experience in the previous computation period, notwithstanding the number of hours of irregular, unscheduled overtime actually worked. Some deputy marshals customarily exceeded an average of over 9 hours per week required for the AUO maximum 25 percent rate.

The parties have used different definitions to describe the work performed by deputy marshals in the D.C. office. The USMS position description for Deputy U.S. Marshals lists nine categories of duties and responsibilities. Summarized, these functions, all related to law enforcement, are: (1) transportation, security and protection of prisoners; (2) courtroom duty, including prisoner control and security for jurors and court personnel; (3) service of writs; (4) security and protection for witnesses and families by monitoring telephones, and surveillance at locations as needed; (5) execution of criminal warrants by helping to investigate, trace, and arrest dangerous persons; (6) assistance to other law enforcement agencies such as the FBI, IRS, etc., in collecting information, surveillance, and seizures; (7) actions under court order for crowd control involving community or extremist resistance; (8) location, identification and seizure of property; and (9) other related duties.

Defendant summarized the principal duties performed by deputy marshals in the D.C. office in five categories: (A) prisoner coordination trips; (B) courtroom duties; (C) execution of warrants; (D) cellblock (prisoner handling before and after hours); and (E) special assignments.

Plaintiffs divided duties performed by deputy marshals in the D.C. office into 12 categories, and organized their evidence on this basis. Plaintiffs' categories were: I. Prisoner Coordination and Transportation (PC); II. Courtroom Duties; III. Serving Process, Writs, and Summonses; IV. Special Assignments; V. Surveillance; VI. Standby Time; VII. Travel Incident to Travel; VIII. Airport Duty; IX. Office Duties; X. Supervisor of Cellblock Personnel; XI. Supervisor of General Assignments in Superior Court; and XII. Supervisor of Court Support in Superior Court.

Each of these systems of cataloging the deputy marshal's duties is adequate to encompass the duties performed by plaintiffs. Plaintiffs' 12 categories have been utilized to determine whether deputy marshals in the D.C. office occupied a position which qualified for AUO premium pay during the relevant period.[23]

Defendant contends that deputy marshals in the D.C. office occupied a position in which the duties required irregular, unscheduled overtime work that could not be controlled administratively. Accordingly, defendant argues, inclusion of deputy marshals in the Department of Justice list of positions eligible for AUO premium pay was valid under the statute and CSC regulations, and plaintiffs were employees whose duties qualified for premium pay on an annual basis. Further, defendant asserts, overtime that occurred in plaintiffs' 12 categories of deputy marshal work was not and could not be regularly scheduled. Therefore, plaintiffs' overtime hours do not qualify for the RSOT exception to AUO in 5 U.S.C. § 5545(c)(2) under either the CSC

---

**22.** D.J.Order No. 1551.2A, Apr. 21, 1972; D.J. Order No. 1551.4A, Aug. 1, 1975. After Aug. 1, 1975, this authority was limited to initial assignments, and the new employee was certified for the AUO rate, if any, which the past experience of previous occupants indicated to be appropriate.

**23.** The description of duties included in plaintiffs' 12 categories are detailed in the findings of fact. Plaintiffs' recommended descriptions have been corrected in the findings to reflect evidence adduced in the record.

or the Comptroller General's tests for regularly scheduled overtime work. In defendant's analysis, the tests for administrative controllability determine the classification of a position as eligible for AUO. Once it is determined that the employee is in an AUO eligible position, whether particular hours of work are to be compensated only on an annual basis under AUO, or, in addition, paid for at the time and one-half rate is determined by the tests for regular scheduling.

Inclusion of deputy marshals in the list of Department of Justice positions eligible for AUO premium pay was valid and authorized by statutory and regulatory criteria. This court, in *Burich,* the district court, in *Fox,* and the trial judge, in *Bilotti,* each have so decided. Plaintiffs in the D.C. office performed work, whether as defined in the official position description or in the categories of the parties, in a position in which the hours of duty "cannot be controlled administratively" by such devices "as the hiring of additional personnel; rescheduling hours of duty * * *; or granting compensatory time off duty to offset overtime hours required." [24]

For purposes of determining whether a position should be classified as eligible for AUO premium pay, it is necessary to examine the nature of the overtime required by the duties involved. Administrative controllability, as used in the AUO statute, deals with the requirement for overtime that is inherent in the nature of the position. The position must be one in which the required overtime cannot be regularly scheduled in advance or eliminated by such

administrative devices as additional manpower, rescheduling duty hours, or compensatory time off.

Deputy U.S. Marshals, as a class of employees in the Department of Justice, are involved in law enforcement. Deputy marshals in the D.C. office are law enforcement officers in the performance of plaintiffs' 12 categories of work.[25] This work in some instances is identical with that of a criminal investigator (surveillance, standby, special assignments), and in all categories is comparable to that of a criminal investigator with respect to the need to perform unscheduled, irregular overtime, the need for which might be anticipated but could not be predicted or controlled. With the exception of standby time, overtime was required in all of plaintiffs' categories in situations where the deputy marshal would be responsible for recognizing the need to continue to work. Such overtime is intrinsic to the position of Deputy U.S. Marshal.

### III.

Determination that the position of Deputy U.S. Marshal properly was listed as eligible for AUO premium compensation does not dispose of plaintiffs' claims. Although plaintiffs' 12 duty categories included work that required overtime eligible for AUO premium pay, it also included work where the overtime could be regularly scheduled and paid for at RSOT rates. The dual systems of premium compensation are mutually exclusive and the same hour of overtime cannot qualify for the RSOT rate and still be counted in a computation period

**24.** 5 C.F.R. § 550.153(a) (1982). Although the CSC regulations include compensatory time off as an administrative control device, plaintiffs eliminated it from their claims "because it has not been alleged as a viable, proper or desirable alternative." The USMS does not grant compensatory time off to deputy marshals (D.J.Order No. 1551.1B, Mar. 27, 1973). Defendant asserts compensatory time off is excluded by the AUO statute as an excepted form of premium pay.

**25.** With the exception of cellblock duties, defendant's five categories of work were the

same as in plaintiffs' Categories I, II, III and IV; cellblock duties were included in plaintiffs' Category II (Courtroom Duties) and Category X (Supervisor of Cellblock Personnel). Defendant's five categories, plus plaintiffs' Category V (Surveillance), describe classical law enforcement functions. Plaintiffs' additional categories describe work that is ancillary to or subordinate parts of the categories enumerated by defendant, or listed in the official position description, and are part of the basic law enforcement functions performed by Deputy U.S. Marshals.

towards AUO.[26] Overtime hours that qualify for AUO may not be compensated by other types of premium pay. Whether a particular hour of overtime qualifies as AUO overtime depends, in part, on whether that hour was, or could have been, scheduled in advance under the regulations.

In its regulations to implement 5 U.S.C. § 5545(c)(2), the CSC did not provide a specific definition for the term "regularly scheduled overtime" in the statutory exception to the authorization for AUO premium pay. The CSC definitions relative to establishment of a regular work schedule are found in 5 C.F.R. Part 610, Hours of Duty, Subpart A, Weekly and Daily Scheduling of Work; and its regulations relative to premium pay are found in 5 C.F.R. Part 550, Pay Administrative (General), Subpart A, Premium Pay. The two sections of the regulations, when construed together, provide the CSC–OPM definition of "regularly scheduled overtime."

The term "overtime work" includes both irregular and occasional overtime work and regular overtime work.[27] "Irregular or occasional overtime work" is overtime that is not regularly scheduled;[28] "regular overtime work" is overtime which is regularly scheduled.[29] "Regularly scheduled administrative workweek" and "basic workweek" are defined terms in 5 C.F.R. §§ 610.102(b) and (c). The "administrative workweek"

for deputy marshals in the D.C. office during the relevant period was 7 consecutive days beginning on a Sunday and ending on a Saturday. The "basic workweek" for deputy marshals in the D.C. office was the 40-hour week scheduled on 5 days, Monday through Friday. Deputy marshals in the D.C. office had a daily tour of duty from 8:30 a.m. to 5 p.m. and the weekly tour was Monday through Friday. The head of an agency is required to establish work schedules. Such schedules are to provide that "assignments to tours of duty are scheduled in advance over periods of not less than 1 week." [30] Plaintiffs' "administrative workweek" included all overtime hours in that week; plaintiffs' "regularly scheduled administrative workweek" included the basic workweek and all regularly scheduled overtime.

The CSC–OPM, and the Comptroller General have given different meanings to the phrase "regularly scheduled," as it appears in both the premium pay statutes and in the CSC regulations. The Comptroller General's decisions assign a meaning that requires regularity in a pattern of occurrence. The CSC–OPM usage means compliance with criteria in the regulations for procedural regularity.

A series of Comptroller General's decisions since 1961 has articulated the following interpretations for "regularly sched-

---

**26.** In a particular pay period, a deputy marshal could receive the AUO supplement applicable to that eligibility period, plus time and one-half for regularly scheduled overtime worked during the pay period. All overtime hours worked during the pay period were compensated, either by the RSOT premium or by the AUO supplement. Overtime hours in a computation period eligible for AUO also counted toward AUO eligibility in future pay periods. Plaintiffs, accordingly, have been paid for all of the overtime hours they worked during the period relevant to their claims.

**27.** 5 C.F.R. § 550.103(h) (1982).

**28.** *Id.* § 550.103(f).

**29.** *Id.* § 550.103(g).

**30.** 5 C.F.R. § 610.121 (1982) in full provides: "Except when the head of an agency determines that the agency would be seriously hand-

icapped in carrying out its functions or that costs would be substantially increased, he shall provide that:

"(a) Assignments to tours of duty are scheduled in advance over periods of not less than 1 week;

"(b) The basic 40-hour workweek is scheduled on 5 days, Monday through Friday when possible, and the 2 days outside the basic workweek are consecutive;

"(c) The working hours in each day in the basic workweek are the same;

"(d) The basic nonovertime workday may not exceed 8 hours;

"(e) The occurrence of holidays may not affect the designation of the basic workweek; and

"(f) Breaks in working hours of more than 1 hour may not be scheduled in a basic workday."

uled" overtime in cases involving AUO and time and one-half pay provisions:

> To constitute "regularly scheduled work," the work must be duly authorized in advance and must be scheduled to recur on successive days or after specified intervals.[31]

> RSOT could be paid, in addition to AUO, when agents on special assignment were scheduled to work 12-hour shifts on successive days.[32]

> Overtime scheduled on a day-to-day or hour-to-hour basis is not "regularly scheduled"; notification of 1 to 4 days in advance is sufficient to constitute overtime scheduled in advance; but to be "regularly scheduled" the overtime must also be scheduled to recur on successive days or after specified intervals.[33]

Defendant says the Comptroller General's definition of "regularly scheduled" when applied to overtime situations does not give effect to the premium payment scheme. The primary responsibility for interpreting the Federal Employees Pay Act rests with OPM,[34] and defendant adopts the CSC–OPM position on the meaning of "regularly scheduled."

According to the CSC–OPM usage, "regularly scheduled" means assignments that are made in compliance with the procedures established in the regulations for scheduling work. The CSC–OPM position, adopted by defendant for this case, is that the term "regularly scheduled overtime" would be overtime hours duly authorized for an individual employee prior to the beginning of the administrative workweek as part of the employee's regularly scheduled administrative workweek.

The USMS, on the other hand, in the August 16, 1976, national agreement with the deputy marshals' union utilized the Comptroller General's definition. In that agreement, time and one-half is paid for overtime work "scheduled in advance of an assignment to recur on 2 or more successive days or after 2 or more intervals of days specified in the schedule." A time limitation on advance notice is not specified.

This court has given content to the term "regularly scheduled overtime." In *Aviles*, the court determined that regularly scheduled for purposes of night differential pay included overtime work that on the facts was habitually and customarily required. Failure to include such overtime in the schedules ignored the reality that the overtime was known to be required and could be controlled. "The mere fact of omitting regular overtime from the scheduled tours of duty does not make such overtime occasional or irregular."[35] This overtime *could* have been scheduled under the regulations, therefore, it *should* have been scheduled. The fact that the amount of overtime which might be required on any particular day was unpredictable as to length did not render the overtime any less regular. "A regular schedule making plaintiffs perform only so much overtime as the processors might require each day" would be adequate to qualify as regularly scheduled overtime, and "would preclude any possible danger of having to pay for overtime hours not actually worked."[36]

In *Burich*, regular scheduling of daily assignments of the deputy marshal which resulted in overtime that, while anticipated, was erratic and irregular did not qualify as regularly scheduled overtime. The overtime that was required to be worked could not be ascertained when the work was scheduled. "Plaintiff was not assigned

31. 40 Comp.Gen. 397 (1961) (night differential to classified employees while on 24-hour standby performing trial trip duty on vessel); 42 Comp.Gen. 326 (1962) (payment of night differential to guards at the Los Alamos Scientific Laboratory of the Atomic Energy Commission).

32. 48 Comp.Gen. 334 (1968) (RSOT for INS agents detailed on special assignment to Meridian, Miss.).

33. 59 Comp.Gen. 101 (1979) (night differential to employees of the Social Security Administration for occasional overtime worked at night).

34. 5 U.S.C. § 5548(a) (Supp. IV, 1980).

35. *Aviles v. United States, supra* note 17, 151 Ct.Cl. at 8.

36. *Id.* at 9.

overtime; he was assigned a task which *might* require overtime." [37]

In 1973, in a case involving regularly scheduled overtime for nursing assistants in a V.A. hospital, the court applied the CSC–OPM test to determine that the overtime involved was "irregular or occasional" because it had not been "regularly scheduled." [38] The overtime in question recurred at symmetrically stated intervals; it consisted of time for changing uniforms before and after scheduled shifts and for instructions before each daily shift. The overtime had been approved by field officers who were authorized to order only "irregular or occasional" overtime, which was defined as all overtime not "regularly scheduled." The court's decision, over a vigorous dissent because the activity in fact had been performed with uninterrupted daily regularity, turned on the concept that "regularly scheduled" overtime was lawfully authorized, *i.e.* regularly prescribed according to applicable statutes and regulations.[39]

In reaching their decisions that certain types of overtime work were eligible for RSOT, neither *Fox*[40] nor *Bilotti*[41] followed the test, approved in *Anderson*,[42] that regularly scheduled overtime is overtime that is regularly prescribed according to the statutes and regulations. In both cases, however, some of the overtime ordered to be paid at time and one-half rates was known to be required and, under the *Aviles*[43] test should have been regularly scheduled any-

way. In view of the personnel limitations in *Fox*, it should have been known that some particular deputies would be required to work overtime on Saturday and after 5 p.m. serving writs, summonses, and other papers, and that some particular deputies would have to be assigned the prisoner coordination trips that could only be scheduled on weekends. In *Bilotti*, the Saturday courtroom duty for arraignments, special assignments for radio monitoring 2 hours before and 2 hours after the daily tour, and long haul prisoner coordination trips assigned to occur on 2 successive weekend days, all were known beforehand to require overtime and could have been assigned to particular deputies.

In the D.C. office, the overtime hours for which plaintiffs now claim time and one-half premium pay were not scheduled for the individual deputy in advance of the administrative workweek. Accordingly, that overtime does not qualify under the CSC–OPM test for regularly scheduled overtime that was approved in *Anderson*. Plaintiffs' contention that all of their AUO overtime hours are entitled to time and one-half pay must fail. Deputy marshals in the D.C. office occupied a position in which AUO premium pay properly was authorized pursuant to the statute and regulations.

During the relevant period, deputy marshals in the D.C. office received the RSOT rate for some hours of overtime work per-

---

**37.** *Burich v. United States, supra* note 15, 177 Ct.Cl. at 145, 366 F.2d at 988.

**38.** *Anderson v. United States, supra* note 17, 201 Ct.Cl. at 660.

**39.** The court's analysis in this regard was:

" 'Regular' may characterize the regular repetition of similar acts in a time frame, or it may only indicate they are correct and proper. It will be seen that defendant has arbitrarily selected one meaning against another, that is, it considers 'regular overtime' is overtime that regularly recurs at symmetrical spaced intervals. * * * Defendant assigns no reason why 'regular overtime' should not be considered to be lawfully authorized overtime, *i.e.*, regularly prescribed according to the statutes and regulations applicable, even if it be irregular so far as concerns constancy and frequency of its recur-

rence. On the other hand, an overtime that was added on to every work day of the year could semantically be 'irregular' if not ordered and directed according to law. Moreover, 'regular overtime' here must be 'regularly scheduled'. The regulation tells us that this means setting up a schedule of working hours that states separately the basic and the overtime hours the employee is required to put in. Nothing of that sort occurred here, nor could occur with respect to preliminary and postliminary activities the ordering authority failed to recognize as being overtime." *Id.* at 664–65.

**40.** *Fox v. United States, supra* note 6.

**41.** *Bilotti v. United States, supra* note 7.

**42.** *Anderson v. United States, supra* note 17.

**43.** *Aviles v. United States, supra* note 17.

formed in plaintiffs' 12 categories, even though other, additional, hours of overtime in those categories properly were, or could have been, logged as AUO. In Prisoner Coordination and Transportation (I), Courtroom Duties (II), Special Assignments (IV), including the Superior Court Saturday detail and lineup night, and Airport Security (VIII), the work sometimes included some overtime eligible respectively for the RSOT rate and the AUO premium. Assignments to these duties would be paid at regular rates for up to 8 hours, RSOT rates for overtime in the hours after 8 and up to 12, and any overtime hours after 12 hours on duty could be logged as AUO. Some of these duties were compensated only under the AUO system before 1975, or, in the case of cellblock duty, 1976. In that part of the relevant period between December 30, 1972, and October 17, 1975, (or Oct. 18, 1976), some of the plaintiffs may have logged as AUO in these categories some overtime hours that should have been regularly scheduled in advance to an individual deputy marshal under the *Aviles* test because they were known to be required. Plaintiffs, however, have not identified any such incidents on the record, and plaintiffs' evidence presently available is not adequate to establish such claims. As the record now stands, and it is incomplete as to any plaintiff for the entire relevant period, all the AUO overtime hours logged were submitted by plaintiffs and approved by supervisors as valid under the AUO system.

During the relevant period many deputy marshals in the D.C. office asked for and received AUO premium pay for overtime work during lunch periods. Defendant asserts that specific prohibitions in the department's regulations made the lunch period nonqualifying for AUO entitlement. One of the types of duty listed in the regulations, however, that qualified for AUO was "Preparation of returns on process and daily logs when necessary immediately to keep work current." Situations can be conjured where a deputy marshal would find it necessary to forego both lunch and a lunch period to keep his work current. There was a practice by some deputy marshals in the D.C. office to "get their hours" in the amounts needed to qualify for a particular AUO percentage rate. In the light of the specific exclusion in the department's regulations, a deputy marshal's logging of a lunch period for AUO premium pay could not be ordered or approved unless exceptional circumstances were specifically found to be present.

The USMS discontinued use of the AUO system, effective October 21, 1978. Plaintiffs assert its abolition in 1978 is proof that the USMS could have discontinued AUO in 1972. Use of the AUO system is discretionary, not mandatory. It does not follow from the termination of the use of AUO that its use in the USMS was improper before October 21, 1978, or that plaintiffs' pay during the period relevant to this case was improperly computed. Presumably, all overtime for which deputy marshals in the D.C. office have been paid at the time and one-half rate after the October 1978 termination has been paid lawfully in accordance with applicable statutes and regulations. After that date, Deputy U.S. Marshals merely no longer have been eligible to rreceive premium pay on an annual basis for irregular, unscheduled overtime in addition to time and one-half for the overtime that was regularly scheduled.

### Conclusion

Deputy marshals in the D.C. office confronted unsatisfactory working conditions that involved substandard facilities, inefficient supervision, low morale, favoritism in job assignments and racially motivated discrimination and retaliation. Plaintiffs, and the Black Marshal Association, through their complaints and affirmative effort were the catalyst that permitted some of the deficiencies in working conditions to be corrected, or ameliorated, through negotiations with the International Council of Deputy Marshal Locals, AFGE.

The AUO system of premium pay was associated intimately with some of the management abuses in the D.C. office; plaintiffs' efforts to correct working conditions included an assault on the AUO system.

This case is a product of those efforts. Plaintiffs are commended for the results their efforts have produced; many of the abuses that gave rise to their complaints have been corrected. Termination of the use of AUO by the USMS will prevent recurrence of abuses generated from the use of that system.

For the reasons set forth, however, plaintiffs' backpay claims for payment at RSOT rates for AUO hours logged during the period relevant to this case must fail. The AUO system was authorized as a method of premium pay for the type of irregular, unscheduled overtime which plaintiffs claimed and for which they have been paid. The two systems are mutually exclusive, and an individual can be paid the RSOT rate in addition to the AUO premium only for overtime hours that were regularly prescribed in accordance with the statutes and regulations.

This opinion is limited to the question of defendant's liability on plaintiffs' principal claim that the use of AUO in the D.C. office was unauthorized. Although plaintiffs' claim fails in this regard, it is possible that documentary evidence exists that will permit plaintiffs to establish entitlement on an individual basis to the RSOT rate for some overtime hours worked in the period between December 30, 1972, and October 1976 that should have been regularly scheduled. Accordingly, the case must be returned to the Trial Division for further proceedings.

\* \* \* \* \* \*

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes that payments to plaintiffs for premium compensation for administratively uncontrollable overtime in the period December 30, 1972, through December 29, 1978, were authorized by Title V, United States Code, section 5545(c)(2), and implementing regulations relative thereto. Trial of these claims was limited to liability issues only and the case is remanded to the Trial Division for further proceedings pursuant to the rules in accordance with this opinion.