Donald R. MANNING

v.

The UNITED STATES.

No. 294–83C.

United States Claims Court.

Aug. 19, 1986.

Larry L. Hines, Oxnard, Cal., for plaintiff.

Elizabeth S. Woodruff, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant; Martha A. Klein, of counsel.

## OPINION

YOCK, Judge.

This civilian pay case involves a claim for overtime pay pursuant to 5 U.S.C. § 5542(a) (1976).

Upon consideration of the entire trial record, including oral arguments, and appropriate post-trial briefings and findings, the Court concludes, for the reasons stated herein, that the plaintiff prevails in this action.

### Facts

The plaintiff, Donald R. Manning, is a federal civilian employee of the Department of the Navy, who was employed from

1973 until 1982 as Special Services Director at the Naval Air Station, Pacific Missile Test Center, Point Mugu, California (PMTC). Prior to becoming the Special Services Director, Mr. Manning had served 20 years on active military duty in the Navy. He retired in 1963 from the PMTC at Point Mugu, where his last tour was as a petty officer in charge of the hobby shop within the Special Services Division.[1] Between 1963 and 1973, the plaintiff served in various federal civilian positions within the Special Services Division at PMTC, until he was selected as the director of the division in 1973.

As Special Services Director, Mr. Manning was responsible for the planning and operation of a comprehensive recreation program that provided recreational services and facilities to approximately 2,500 active duty and 30,000 retired military personnel and their dependents living in and around the Point Mugu, California area. Facilities provided at the base included, among other things, a gymnasium, hobby and craft shop, a bowling alley, beach motel and cabins, beach club, teen clubs, swimming pools, sailboats, fishing boats, and a golf course. Retail stores and snack shops were provided in connection with many of these facilities.

The plaintiff administered the special service program through a staff of between 40 and 70 individuals over the course of the 1973–1982 timeframe at issue. In 1973, the Special Services Division's employee count was approximately 70 individuals with some 20 being military personnel and the rest being civilian personnel. Starting in 1974, the employee count began to recede due primarily to the retrenchment of funds available to the military services at all levels. By 1976, all of the military personnel had been withdrawn from the Special Services Division (SSD). By the end of 1981,

the SSD was operating with approximately 45–50 individuals.

At virtually the same time (1974) that the SSD employment began to recede, the plaintiff's Command structure directed that the hours of many of the recreational facilities at the base were to be expanded. Prior to January of 1974, the recreational facilities at Point Mugu were open on a five-day-per-week basis. However, in January 1974, the PMTC Executive Officer, Commander Thompson, requested that Mr. Manning expand the hours of operation from five to seven days with regard to the base golf course, the Navy exchange snack shop, the hobby shop, the gymnasium, the swimming pools, and several other of the recreational facilities. Mr. Manning responded to his Command's directions by opening the facilities on a seven-day-per-week basis, but not before advising that doing so would require employment levels to remain constant. As already indicated, however, by 1976, the 20 military personnel had been withdrawn even though the facilities continued to be open on a seven-day-per-week basis.

In addition to the loss of personnel and the increase in the facilities' hours as indicated above, the plaintiff's Command, during the 1973–1981 timeframe, assigned many additional responsibilities to the Special Services Division which previously had not been performed by the division. Some of these additional assignments fell within the recognized purview of the SSD's responsibilities, and some did not. Those assignments that *were* within the scope of the division's responsibilities included: turning the golf course's snack bar operation, which had formerly been run by the Navy Exchange, over to the SSD in 1974; turning the operating responsibility of the Navy Exchange motel over to the SSD in 1975; locating, acquiring, and operating a fishing boat for the Command in 1976; in-

---

**1.** The correct title of the Special Services Division appears to vary depending upon which document, which party, or which year is being referred to. The Court is aware that the parties sometimes refer to the Special Services Division as the Special Services Department, or the Recreation Division of the Administrative Department, but for the purposes of clarity and consistency, this Court will use the title of Special Services Division to refer to the organization entity that the plaintiff directed.

stalling a computerized inventory system that would keep track of all retail inventory items for sale by the SSD in 1979; and fashioning a monthly reporting system for the commanding officer in 1981 that compared the expenditures of appropriated and nonappropriated funds within the SSD. Those assignments that *were not* within the scope of the SSD's responsibility included: assignment by the commanding officer in 1974 of Mr. Manning as Disaster Control Officer for all base housing; transferring maintenance responsibilities of two base swimming pools from the Public Works Department to the SSD in 1976; transferring responsibility from Public Works in 1980 for planning, assembling, and installing playground equipment for 20 of the base's housing areas; and transferring from the base's Public Information Office at some unspecified time during this timeframe the responsibility for changing Command messages on eight outside signboards that were at various locations on the base. Many of these matters detailed above took an enormous amount of Mr. Manning's, as well as his division employees', time.

In order to cope with all of the above, in early 1974, Mr. Manning and many of his employees, started to work considerable hours of overtime. Mr. Manning dutifully recorded all of his overtime hours on his time cards and turned them in to the Command. The Command, at first, authorized Mr. Manning's overtime as recorded on his time cards and dutifully paid him. However, at some point in the spring of 1974, CDR J.M. Rochford, the plaintiff's Administrative Officer, started to balk at paying Mr. Manning all of the overtime he was working, indicating to Mr. Manning that it was costing the Command too much money. He thereupon advised Mr. Manning that he was going to request from the Director of Civilian Manpower Management of the Department of the Navy, in Washington, D.C., authority to pay him regularly scheduled standby duty pay for those hours that he had to work beyond the normal 40-hour workweek, pursuant to the authority contained in 5 U.S.C. § 5545(c)(1)

(1976). Standby duty pay would be paid to Mr. Manning at the rate of 25 percent of his normal hourly rate, limited to the first step of a GS–10 rating. Normal overtime is, of course, paid at a rate of one and a half times (150 percent) the normal hourly rate of the federal employee limited to the first step of a GS–10 pursuant to 5 U.S.C. § 5542(a) (1976). Mr. Manning did not particularly think this arrangement was appropriate or fair, since he would undoubtedly not be merely standing by but would in fact be working at his normal duties that could not be completed in his regular 40-hour week and so informed Commander Rochford. The Command, however, thought the arrangement to be fair and appropriate and thus submitted the request to Washington, D.C.

In a letter directed to the plaintiff's commanding officer on July 31, 1974, the Navy's Director of Civilian Manpower Management authorized the standby pay for Mr. Manning. The letter in pertinent part reads:

1. Reference (a) requests authority, in accordance with reference (b), to apply an annual premium rate to the compensation of the incumbent of the position of Special Services Director, GS–11.

2. Reference (a) indicates that the Special Services Director will have a tour of duty involving a scheduled 40-hour workweek of five days and, in addition, 28 hours of regularly scheduled standby duty. On the basis of these hours, assuming that the standby duty is performed at a worksite or at some other appropriate on-station location, a 25 percent rate is approved under the criteria of reference (c). The annual rate is limited to that part of the Special Services Director's salary that does not exceed the scheduled minimum rate of GS–10.

3. Any irregular or occasional overtime, night, or holiday work performed in excess of the Special Services Director's regularly scheduled weekly tour of duty will be compensated at the appropriate overtime, night, and holiday rates in ac-

cordance with the provisions of reference (d).

Thereafter, the Command ordered and authorized Mr. Manning to work a normal 40–hour workweek Monday through Friday from, 0800–1630, and then to proceed on a regular standby schedule from 1630–1900 (2½ hours) every weekday, plus 0700–1630 (9½ hours) on Saturday and 1000–1600 (6 hours) on Sunday. The regular scheduled standby duty amounted to some 28 hours per week.

From the unrebutted testimony elicited at trial, the Court knows that one of the Command's motives for requesting standby pay authority for the plaintiff in 1974 was to reduce the large amount of money that the Command was paying to Mr. Manning for his overtime. What the Court does not know, however, is whether there were other more appropriate—and perhaps more to the point—legal motives, for placing Mr. Manning in standby pay status. The Court does not have this information because all the background communication and justifications that went back and forth between the plaintiff's Command and the Director of Civilian Manpower Management in 1974 were lost. Searches were made in all likely offices for the records at Point Mugu as well as in Washington, D.C., but to no avail. The only documents that were found and presented to the Court were the July 31, 1974 letter of authorization from the Director in Washington, and the standby schedule for the Special Services Director.

In addition, the Court did not have the benefit of any contemporary witnesses that may have shed light on the Command's reasons for requesting Mr. Manning's standby status. Commander Rochford, the plaintiff's Administrative Officer, who initiated the idea of standby pay for the plaintiff in 1974, was not called as a witness even though he was listed as a Government witness in the Government's Rule 16 pretrial statement, the Court identified him as a critical witness, and requested that his testimony be made available to the Court. Commander Rochford was retired, available, and living within the Ventura, California area where the case was tried.

From 1974 through 1981, Mr. Manning continuously advised each succeeding Commanding Officer, Executive Officer, and Administrative Officer in his Command that he needed adequate manpower to take care of the enormous work loads that were placed upon his division. Although the various officers occupying these positions were sympathetic to his problem, manpower available to the division continued to decline, and the staff officers continued to load the division up with more and more work. Some of the work, as already indicated, was work transferred from other organization entities such as Public Works, and the Navy Exchange. For instance, CAPT. James Webb, who was plaintiff's Commanding Officer from 1978 through 1982, assigned the Special Services Division the enormous job of assembling and placing all playground equipment at the 20 housing locations on the base because he was confident that Mr. Manning and his division could get the job done right and quickly. This job should have been assigned, organizationally, to the Public Works Department at the base. From a review of the plaintiff's outstanding annual performance evaluations and various letters of commendation during this 1974–1981 timeframe, it is clear that virtually all of the plaintiff's superiors concurred with Captain Webb (at least up through the first half of 1981) that if you needed something done at the base, and wanted it done correctly and quickly, call on Mr. Manning and his Special Services Division people.

Moreover, as time dragged on, with more work to do and fewer employees to do it, Mr. Manning began to complain to his superiors about his standby pay status. Although the plaintiff's complaints were always made in conjunction with his manpower/workload discussions, he would advise his superiors that he was actually working during the scheduled standby hours, and he felt that he should be paid for those hours on an appropriate basis. Mr. Manning specifically identified Captain

Webb as one of the officers that he discussed the matter with. When asked at trial about this matter, Captain Webb could not remember whether Mr. Manning had or had not discussed the pay matter with him. Since the Court found Mr. Manning to be a credible witness, it finds that Mr. Manning did in fact bring the matter up for discussion with Captain Webb.

Mr. Manning kept meticulous time cards during the entire timeframe involved. Many weeks his time cards would reflect not only his normal 40–hour workweek and his 28 hours of scheduled standby hours, but also additional hours of overtime. When this would happen, the Command never discussed the extra overtime hours showing on the time cards contemporaneously with the event, but simply paid the plaintiff for his normally scheduled 68 hours (40–hour normal workweek plus 28 standby hours). It was only after the plaintiff filed his overtime case in Federal District Court on July 27, 1982, that the Navy again reviewed the plaintiff's time cards and retroactively approved and authorized the overtime hours claimed over and above the regularly scheduled 68 hours. Plaintiff was paid some $8,600 for this overtime on or about September 15, 1982.

In the summer of 1981, several events occurred which had a negative impact on Mr. Manning's career as Director of the Special Services Division. The plaintiff's superior command conducted an audit of the Special Services Division and found several areas of unsatisfactory performance. Although most of the matters were minor and could be remedied relatively easily, the plaintiff's Command was not pleased with having a less than satisfactory rating in one of its divisions and so informed plaintiff. One of the matters at issue was late performance evaluations for several of the SSD employees. The Command imposed certain time limits to clear up these matters and other related audit concerns. These time limits were not met. This caused relations between the Command and Mr. Manning to rapidly deteriorate. At about the same time, Mr. Manning's relationship with his Administrative Officer, Commander Drake, reached its low point. Again, the problem seemed to stem from a disagreement over performance ratings for individuals within Mr. Manning's division. In any event, the matter reached a stage where Mr. Manning eventually filed a grievance against Commander Drake. After several conferences and meetings were held to resolve the problems, the senior naval officer in the area resolved the matter by transferring Mr. Manning to a new job at the base, effective January 10, 1982.

On July 27, 1982, the plaintiff filed an action in the United States District Court for the Central District of California seeking overtime pay and restoration of annual leave. The matter, however, was transferred to this Court since the claims appeared to seek money damages in excess of $10,-000. 28 U.S.C. § 1346 (1982). In an earlier opinion, *Manning v. United States*, 7 Cl.Ct. 128 (1984), the Court denied the parties' motions for summary judgment on the overtime pay issue and set the matter for trial. The Court also returned the restoration of annual leave matter to the district court for final resolution, since this Court lacked subject matter jurisdiction.

On September 18–20, 1985, trial was conducted in Ventura, California, on the plaintiff's overtime pay claim.

## Discussion

Plaintiff's claim for overtime in this case is based on the factual assertion that he worked each and every hour of the 28 hours that he was scheduled for standby pay, and that his Command knew it from the start and at all times thereafter. Therefore, in effect, if not in fact, the plaintiff's Command duly authorized overtime pay instead of the lower paid standby duty pay.

The defendant counters the plaintiff's assertions by arguing basically three points. First, even assuming that the plaintiff has a meritorious claim for overtime pay, the claim should be barred by the equitable

doctrine of laches, because the plaintiff delayed too long in bringing his action. Second, assuming that laches does not bar his claim, the plaintiff on the factual merits did not actually work during the 28 hours that he was scheduled for and served on standby duty. Third, even if the plaintiff performed actual work during a substantial portion of his 28 hours of standby duty, he did so as a volunteer because he was never officially ordered or authorized to do actual work for overtime pay.[2]

As earlier indicated, the Court concludes that the plaintiff prevails in this action.

### I.  Laches

The defendant asserts that even if the plaintiff is entitled to overtime compensation under 5 U.S.C. § 5542(a) (1976), his claim should be barred by the equitable doctrine of laches. This Court, however, disagrees with the defendant in this regard and concludes that the affirmative defense of laches is inappropriate for use under the facts as outlined herein.

■ The application of laches denies relief to one who has unreasonably and inexcusably delayed in the assertion of a claim when this delay has resulted in prejudice to the defendant. *Brundage v. United States,* 205 Ct.Cl. 502, 505, 504 F.2d 1382, 1384 (1974), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); *Albright v. United States,* 161 Ct.Cl. 356, 362 (1963).

In a claim for back pay, the Court of Claims has articulated the standard for application of the laches defense. Its words are readily applicable to this case:

Laches is an equitable defense, and in its operation it fulfills the same function as the statute of limitations at law. However, laches, unlike the statute of

limitations, is a flexible concept based on fairness and applied in the discretion of the court. The cause of the delay, the hardship to the defendant, the nature of the relief, and other factors must all be considered in determining its application.

\*     \*     \*     \*     \*     \*

Congress has specifically provided a six-year statute of limitations for claims asserted in this court. Ordinarily a claimant has the full statutory period. It is only where some great injustice would be done the defendant by so long a delay by the claimant that the doctrine of laches should be set up to defeat consideration of the claim on the merits.

*O'Brien v. United States,* 148 Ct.Cl. 1, 3–4 (1960).

While laches has been raised as a defense to civilian and military pay actions in this Court, it has not generally been allowed in actions for overtime pay. *See Anderson v. United States,* 201 Ct.Cl. 660, 695 (1973); *Detling v. United States,* 193 Ct.Cl. 125, 132, 432 F.2d 462, 465–66 (1970); *Albright v. United States,* 161 Ct.Cl. 356, 362 (1963); *Ahearn v. United States,* 142 Ct.Cl. 309, 313–14 (1958). The reason for this is that the potential prejudice to the defendant is much less in an overtime pay case than in other types of military and civilian claims (*i.e.,* wrongful separation or reductions in rank). Perhaps the court in *Albright* explained its prior reasoning most clearly when it stated:

Laches has been raised as a defense to pay actions in this court on numerous occasions, primarily in the areas of wrongful separation, reduction in rank, and overtime pay. While we have, on occasion, allowed the defense in the case

---

**2.** The defendant also has made a fourth point in its defense by asserting that the standby pay statute under which the plaintiff was paid (5 U.S.C. § 5545(c)(1) (1976) ) specifically precludes the payment of any additional premium pay (overtime) for the same hours. The Court, however, views this argument as simply one more variation of the "lack of authorization" point to be discussed in more detail under point three above. In any event there is no issue of double payments for the same hours worked,

since the plaintiff is only requesting the difference between what he was already paid for standby duty and what he claims he should have been paid under the appropriate overtime statute (5 U.S.C. § 5542(a) (1976) ). The issue still boils down to a factual and legal assessment of what the Command authorized the plaintiff to do by its actions. Of course, if the plaintiff was only properly authorized to receive standby pay, then he would be precluded from receiving any other premium (overtime) pay.

of wrongful discharges (*Bailey v. United States,* 144 Ct.Cl. 720, 171 F.Supp. 281 (1959); *Miner v. United States,* 143 Ct.Cl. 801, *Stager v. United States,* 57 Ct.Cl. 116), it has not been allowed in actions for overtime pay (*Aviles, et al. v. United States,* 151 Ct.Cl. 1 (1960); *Ahearn, et al. v. United States,* 142 Ct.Cl. 309; *Winsberg v. United States,* 120 Ct.Cl. 511; *Poggas v. United States,* [96 F.Supp. 609, 93 F.Supp. 1009] 118 Ct.Cl. 385). The reason for this is defendant may be prejudiced by the delay in one case, but not in the other. Where the defense has been allowed, the defendant has been injured because it has employed another to replace the discharged employee and, thus, has been required to pay two salaries for a period of time, which it would not have been required to pay had the plaintiffs filed their suits more promptly. This factor is lacking in the cases involving overtime.

*Albright, supra,* 161 Ct.Cl. at 362–63.

In those rare instances in which the laches defense *has* been allowed in an overtime pay case, the defendant has been greatly prejudiced because of plaintiff's extraordinary delay in bringing his claim combined with several other significant reasons. For example, in *Murphy v. United States,* 222 Ct.Cl. 559 (1980), the laches defense was allowed on a Government employee's overtime claim due to a long delay of some 13 years before the employee's suit was filed, and because *all* of the records covering plaintiff's working time had been destroyed pursuant to validly promulgated agency regulations. Thus, the Government was severely prejudiced in its attempts to reconstruct events and adequately defend against the claim.

█ In contrast to the *Murphy* case, the delay in the instant case is no where near as long nor are there any other significant reasons to apply the equitable doctrine of laches against the plaintiff. Although some records have been lost, their loss has in no way prejudiced the defendant from presenting an appropriate defense on the merits. This is so because the critical records, *i.e.,* the plaintiff's contemporaneously made time cards, have not been destroyed and were made available to the parties and the Court in the trial of this action. Also, the lost documents were not lost (or destroyed) due to any validly promulgated regulations. The records involved the Command's request and justifications, to the Navy's Director of Civilian Manpower Management, for plaintiff's ongoing standby status and should have been, but for negligent record keeping, made available to the Court. The prejudice, if any, to the defendant's defense because of the loss of these documents was not caused by the plaintiff, but was the defendant's own responsibility. The records not only should have been kept, in view of the plaintiff's ongoing status in standby pay, but, in fact, periodically reviewed by the plaintiff's Command under the requirements imposed in 5 C.F.R. § 550.161(f) (1970). This regulation imposed a duty upon the agencies that have authorized standby duty pay to review those determinations at "appropriate intervals" to see whether the needs remained the same and could be currently justified under the guidelines contained in the authorizing statute and regulations. This management review process was never accomplished in this case.

In addition to the defendant arguing that the lost records precluded it from adequately presenting its defense, defendant also asserts that the passage of time deprived it of having live witnesses available to testify for its defense. The problem with this contention is that it simply is not true. Many witnesses were available and living in the area that could have testified to the events during the timeframe at issue. As a vivid example, Commander Rochford, the very person in the plaintiff's Command who had requested standby status authority from Washington for the plaintiff in 1974, was available to testify. He was listed as a Government witness on the Government's Rule 16 pretrial statement, he was retired and living in the Ventura, California area when the case was tried and the Court specifically requested

that Commander Rochford's testimony be made available at trial. Yet, the Government did not call him. Clearly, the Government's own actions were a major factor contributing to its inability (if there was any) to properly defend this case.

In any event, it is clear to the Court that the equities in regard to the laches defense lie with the plaintiff and not the Government. Therefore, the Court finds the defense to be inapplicable under the facts as outlined herein.

## II. Merits

Having disposed of the Government's laches argument, the Court must now look to the merits of the plaintiff's claim to determine whether he may recover in this case.

In order to allow recovery for the plaintiff in this overtime case, the Court must find as fact that: (1) plaintiff actually performed the normal work of his position during the hours that he was scheduled to be in standby status; and (2) his Command, by their actions, ordered or approved the overtime work.

Congress has, by law, provided federal civilian employees with several forms or types of premium compensation for work beyond the regular 40–hour workweek. All of these types of premium pay are codified in sections 5541–50 of Title 5 of the United States Code, and they relate to premium pay for overtime, night, standby, irregular, hazardous duty or Sunday and holiday work. The two types of premium pay here at issue are overtime pay and regularly scheduled standby duty pay.

Overtime pay is the proper premium compensation for work which has been "officially ordered and approved" in excess of the normal 40–hour workweek. Authorized overtime must be compensated at a rate of one and one-half times the employee's basic hourly rate. The overtime statute reads in pertinent part:

> (a) For full-time, part-time and intermittent tours of duty, hours of work officially ordered or approved in excess of 40 hours in an administrative work-

week, or * * * in excess of 8 hours in a day, performed by an employee are overtime work and shall be paid for, * * *.

5 U.S.C. § 5542(a) (1976).

Premium pay for regularly scheduled standby duty is an appropriate substitute premium compensation for employees that meet the criteria that Congress and the Office of Personnel Management have imposed by statute and regulations. The standby pay authorization statute reads in pertinent part:

> (c) The head of an agency, with the approval of the Office of Personnel Management may provide that—.
>
> (1) an employee in a position requiring him regularly to remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for irregular, unscheduled overtime duty in excess of his regularly scheduled weekly tour. Premium pay under this paragraph is determined as an appropriate percentage, not in excess of 25 percent, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS–10 * * * by taking into consideration the number of hours of actual work required in the position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of the position are made more onerous by night, Sunday, or holiday work, or by being extended over periods of more than 40 hours a week, and other relevant factors; * *.

5 U.S.C. § 5545(c)(1) (1976).

Similarly, 5 C.F.R. § 550.141 (1970), authorizes:

> An agency may pay premium pay on an annual basis, instead of the premium pay prescribed in this subpart for regu-

larly scheduled overtime, night, holiday, and Sunday work, to an employee in a position requiring him regularly to remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work. Premium pay under this section is determined as an appropriate percentage, not in excess of 25 percent, of that part of the employee's rate of basic pay which does not exceed the minimum rate of basic pay for GS–10.

Clearly, regularly scheduled standby duty authorization may only be viewed as an appropriate substitution for overtime or other premium compensation when the employee or position meets the appropriate statutory and regulatory conditions.

The regulations detail the appropriate conditions and requirements that the agencies must take into account in deciding whether it is appropriate to authorize standby pay status as a substitute for overtime pay. For instance, the regulations define and explain "standby status" in the following way:

An employee is in a standby status, as referred to in § 550.141, only at times when he is not required to perform actual work and is free to eat, sleep, read, listen to the radio, or engage in other similar pursuits. An employee is performing actual work, rather than being in a standby status, when his full attention is devoted to his work, even though the nature of his work does not require constant activity (for example, a guard on duty at his post and a technician continuously observing instruments are engaged in the actual work of their positions). Actual work includes both work performed during regular work periods and work performed when called out during periods ordinarily spent in a standby status.

5 C.F.R. § 550.143(e) (1970). Likewise, the terms "longer than ordinary periods of duty" and "a substantial part of which consists of remaining in standby status rather than in performing work" are similarly defined and explained in the following manner:

(c) The words "longer than ordinary periods of duty" in § 550.141 mean more than 40 hours a week.

(d) The words "a substantial part of which consists of remaining in a standby status rather than performing work" in § 550.141 refer to the entire tour of duty. This requirement is met:

(1) When a substantial part of the entire tour of duty, at least 25 percent, is spent in a standby status which occurs throughout the entire tour;

(2) If certain hours of the tour of duty are regularly devoted to actual work and others are spent in a standby status, that part of the tour of duty devoted to standing by is at least 25 percent of the entire tour of duty; or

(3) When an employee has a basic workweek requiring full-time performance of actual work and is required, in addition, to perform standby duty on certain nights, or to perform standby duty on certain days not included in his basic workweek.

5 C.F.R. § 550.143(c)–(d) (1970). Additionally, the regulations define the "type of position referred to in § 550.141 that an employee regularly remain at" as being a position that has to meet the following conditions:

(1) The requirement must be definite and the employee must be officially ordered to remain at his station. The employee's remaining at his station must not be merely voluntary, desirable, or a result of geographic isolation, or solely because the employee lives on the grounds.

(2) The hours during which the requirement is operative must be included in the employee's tour of duty. This tour of duty must be established on a regularly recurring basis over a substantial period of time, generally at least a few months. The requirement must not be occasional, irregular, or for a brief period.

(3) The requirement must be associated with the regularly assigned duties of the employee's job, either as a continuation of his regular work which includes standby time, or as a requirement to stand by at his post to perform his regularly assigned duties if the necessity arises.

5 C.F.R. § 550.143(a) (1970).

The typical employment situation that meets the criteria in all critical respects, and the occupation that appears to have had a major impact in causing the Congress to authorize standby pay status in the first place was the firefighter. *See Bean v. United States,* 146 Ct.Cl. 267, 175 F.Supp. 166 (1959). Clearly, the typical firefighter spends long hours at his job, must be at his station, and yet spends many hours in standby status waiting for the fire emergency to happen. Although the firefighter example is the easy one to identify, clearly other positions and occupations may qualify under the above-mentioned criteria. Whether the plaintiff's managerial position as head of the Special Services Division properly qualifies, however, is a matter of considerable concern to this Court.

With the above guidelines in mind, it is now appropriate to determine whether or not the plaintiff was actually working and performing the duties of his job during the scheduled standby hours, and whether, as he alleges, the plaintiff was authorized to perform overtime duty.

### A. Actual Work vs. Standby Duty

The plaintiff has alleged throughout this proceeding that he actually worked, doing the duties required of his position for each and every hour of the 28 hours per week that his Command scheduled him for standby duty. Plaintiff further alleges that his Command knew that he was actually working from the start and at all times thereafter, and, therefore, duly authorized him to perform overtime work instead of the lower paid standby duty.

 In order to allow the plaintiff to recover in this action, the Court must first be convinced that the plaintiff did in fact work a substantial percentage of the 28 hours (at least 75 percent of the 28 hours) that he was scheduled for standby duty. Unless the plaintiff can get over this first hurdle, he cannot win the race. Taking all the evidence presented to this Court at trial into consideration, however, the Court is convinced that the plaintiff did in fact work virtually each and every hour that he was scheduled for standby duty.

First of all, the plaintiff took the witness stand and stated unequivocally that there was so much work to do in running his Special Services Division that he had no choice but to work those 28 hours that he was scheduled to standby. There were so many reports to prepare, personnel papers to consider, inspections to make, projects to direct, equipment breakdowns to fix, supervisory functions to accomplish, and meetings to go to, that he was actually working all of the 68 hours that he was scheduled to be on the base. There simply was no time to standby, listen to the radio, eat, or sleep, as contemplated under the standby regulations. In observing Mr. Manning's demeanor on the witness stand during the course of the three-day trial, the Court found the plaintiff to be a highly believable and credible witness.

In addition to the plaintiff's own direct testimony that he worked each and every hour of the scheduled 28 standby hours, the plaintiff also presented several employees of the Special Services Division that corroborated his testimony. All testified that whenever they were working, they observed Mr. Manning around the base also doing work, and this was true whether they were working their regular shift or putting in overtime. Typical of the evidence received from the plaintiff's corroborating witnesses was the testimony of Ms. Janice Johnston, who was a supervisory accounting technician in the Special Services Division at the time of her testimony. Ms. Johnston testified that her department was sometimes short staffed or had special projects assigned to it and therefore would have to work overtime on Saturday or Sunday. She stated:

[JOHNSTON] Any time that we worked overtime on Saturdays or Sundays, he [Manning] was always there.

Q   Is that statement in reference to any overtime that you ever worked or only with reference to the overtime you did on the monthly financial report?

[JOHNSTON] In any overtime. He was always there to let us in and close up.

Q   What time did you customarily get to work in the morning?

[JOHNSTON] At 8:00.

Q   And he was always there to let you in?

[JOHNSTON] That's correct. He was always there before we were.

Ts. at 435.

Likewise, the Government witnesses in their testimony (usually on cross-examination) were forced to admit that they observed the plaintiff around the Special Services facilities on the base on many occasions whenever they were on base during the weekends or during off-duty hours. In fact, there is no evidence in the record, from any source, that casts any doubt on the plaintiff's testimony that he was working each and every hour that he was scheduled for standby duty. There is absolutely nothing in the record to indicate that the plaintiff even spent any of those 28 hours of standby status eating, sleeping, or listening to the radio which are the hallmarks of standby status.

When one couples the above-discussed direct testimony on the actual work issue, with the other evidence showing that the Special Services Division was constantly being assigned special projects, was constantly losing personnel and was constantly being asked to extend hours of operations, one can only come to the logical conclusion that Mr. Manning was telling the truth and that he was a very busy man indeed. Even if the Command had scheduled the plaintiff for standby duty, there was no way that he could have "stood by" and still accomplished his duties as assigned by his Command.

Based on the above discussion and facts, the Court concludes that the plaintiff did in fact work, performing the duties of his position, each and every hour of the 28 hours he was scheduled for standby duty.

## B.  Authorization

Having concluded that the plaintiff performed actual work during the 28 hours per week that he was scheduled for standby duty, the Court must now focus on the authorization issue. Even though this Court has found as fact that the plaintiff actually worked those 28 hours, unless the plaintiff can further convince this Court that he was duly authorized (before or after the fact) to perform overtime work, he will be considered a volunteer and still not entitled to recover. This is true because the overtime statute specifically requires not only the performance of the work, but that the work be "officially ordered or approved." 5 U.S.C. § 5542(a) (1976).

The Court begins the inquiry by focusing on the surrounding circumstances pertaining to the written documents that authorized the standby pay for the plaintiff commencing in the summer of 1974. Starting almost immediately in late 1973, when the plaintiff took over as head of the Special Services Division, the division began to lose personnel due to funding difficulties, and at the same time, the division was ordered to expand its hours of operation for many of its facilities. With the increased hours and decreased personnel situation a reality, and in order to accomplish all of the tasks and responsibilities assigned to the division by his Command, the plaintiff, in early 1974, began to work considerable hours of overtime. These hours were always meticulously recorded on Mr. Manning's time cards. At first, the Command had no difficulty with the plaintiff's overtime hours worked, and duly approved and paid him for it (at least most of it). However, at some point in the spring of 1974, Commander Rochford, the plaintiff's Administrative Officer, balked at paying the plaintiff any more overtime and advised him that he was going to seek standby pay for the plaintiff. The plaintiff testified to the

following circumstances which took place between them:

Q Let's limit this to January of 1974 and July 31, 1974.

[MANNING] Because of the number of hours I was putting in, one day Commander Rochford called me up and said, I'm going to see if I can't get you premium time. Up to that point in time, I had never known there was a thing like premium time.

THE COURT: Were you putting in hours beyond 40?

[MANNING]: Yes, sir.

THE COURT: And were you being paid overtime for those hours?

[MANNING]: Not, all the time. Commander Rochford was a very frank individual, and he said that they just couldn't afford it, they needed the work but they couldn't afford the overtime.

THE COURT: Did you put in for chits to work over time, or how did you make the arrangements?

[MANNING]: I was never required to put in a chit for overtime.

THE COURT: How did the Command deal with the overtime pay then?

[MANNING]: It was left to me. If I saw it was necessary for me to stay, or have anybody to stay, I would just do it.

\* \* \* \* \* \*

[THE COURT]: [Y]ou were called in by the Command, and you were told that you were going to have premium pay, right?

[MANNING]: I was—sir, I was called in by Commander Rochford and I was told that they couldn't afford to pay me for all the overtime hours I was working, and then he said he was going to seek and try to get for me premium pay. Now, at that time, he showed me a letter, and I cannot really truthfully tell you where he got it, because I don't know, but he showed me a letter where some Officer's Club manager had gotten light premium pay. And then he is the one who sought out and spearheaded the effort and, I guess, he prepared the letter,

because I didn't, and went back and requested that I be given premium pay.

I do not think at the time that he requested the premium pay that he said any specific amount of premium pay. I think that they came back and told him the percentages and gave us a breakdown.

Ts. at 142–43, 147–48.

■ From the above unrebutted testimony, the Court concludes that one of the prime motives for placing the plaintiff on standby duty status was to save the Command money even though it needed the overtime work accomplished. Unfortunately, the Court does not know whether the Command had other, more legitimate, motives for requesting the standby status for the plaintiff, since the documents that requested and justified the request were lost, and the Government failed to call Commander Rochford to testify on the point. In any event, since Commander Rochford was a critical Government witness, retired, living and available to the Court in the Ventura, California area, where this case was tried, it is appropriate to infer and conclude that had he been called he would not have given testimony more favorable to the Government. *Hageny v. United States*, 215 Ct.Cl. 412, 432, 570 F.2d 924, 935 (1978); *Sherwin v. United States*, 193 Ct.Cl. 962, 984–85, 436 F.2d 992, 1005 (1971); *Althaus v. United States*, 7 Cl.Ct. 688, 692 (1985); *Barnett v. United States*, 6 Cl.Ct. 631, 671 (1984). We find plaintiff's testimony credible and an accurate reconstruction of the circumstances surrounding the setup of the standby arrangement.

From the above discussion, it is very clear that the standby status was arranged by the plaintiff's Command in 1974 primarily to save the defendant from paying the plaintiff relatively large amounts of overtime pay. The Command needed the work accomplished, but they did not want to pay the money to have it accomplished. In 1974, the Command knew that even with the standby duty authorized from Washington, D.C., that the plaintiff would be doing actual work during the hours that he

was scheduled for standby pay. Not only did the Command have this knowledge in 1974 when it set up this arrangement, but that knowledge continued throughout the entire timeframe at issue in this case.

Overtime work performed with the knowledge and inducement of supervisory personnel is deemed to be "officially ordered or approved." The law will treat as issued those orders that ought to have been issued. *See Anderson v. United States*, 201 Ct.Cl. 660 (1973); *Byrnes v. United States*, 163 Ct.Cl. 167, 330 F.2d 986 (1964); *Aviles v. United States*, 151 Ct.Cl. 1 (1960); *Bennett v. United States*, 4 Cl.Ct. 330 (1984). The factual situation in *Byrnes* is instructive as an analogy to this case. In *Byrnes*, two regional offices of the Internal Revenue Service refused to formally authorize regular overtime for their investigators but informed the employees that they would still be expected to carry out their duties as IRS agents, even if this meant overtime hours. The Court of Claims refused to give credence to the Government's claim that the agents were to go uncompensated for their hours given the lack of written approval of the overtime holding: "The invocation of departmental regulations requiring specific written authority for overtime cannot avoid the plain requirements of the statute for overtime pay when the performance of this overtime is induced by the Government * * *." *Byrnes, supra*, 163 Ct.Cl. at 174, 330 F.2d at 989–90.

In this case also, plaintiff was clearly induced to put in overtime hours. He was directly ordered by his Command to increase days and hours of the Special Service facilities at the base, yet at the same time suffered a steady loss of staff to help him keep the facilities open and running. In addition, he was given many special projects, such as the playground equipment project that took enormous amounts of his and his staff's time. In early 1974, the plaintiff was already working overtime hours that were costing the Command considerable amounts of money. In order to cut this considerable cost and yet retain the services, the Command arranged for the

plaintiff's standby schedule. The very purpose for the scheduled standby duty was to give the plaintiff some minimal form of compensation for his overtime work and yet not subject the Command to the full statutory costs of overtime pay. Mr. Manning was not satisfied with this arrangement in 1974 and did, in fact, complain about it to Commander Rochford, but was told that although the Command needed the overtime work done, they could not afford to pay him. The defendant cannot have it both ways; if his Command could not afford to pay plaintiff for his overtime, it should have made other arrangements. The Command could have cut back the hours of operation for their Special Services facilities, assigned more military personnel to the plaintiff's staff, or whatever. What the Command could not do is what it did, *i.e.*, pay him less than overtime rates for actual overtime work. Any contention by the Government the he somehow "volunteered" to perform extra work is disingenious. Plaintiff was placed in a position in which to fulfill his responsibilities as Special Services Director, he had to work overtime. His Command knew this throughout the entire timeframe at issue here and therefore induced it. These facts satisfy the statutory requirement of overtime being "officially ordered or approved." 5 U.S.C. § 5542(a) (1976).

The Government has relied heavily on the assertion that over the years the plaintiff was receiving standby pay, he never alerted his superiors to the fact that he was actually working during the scheduled standby hours, and thus should be denied this overtime. The simple answer to this, however, is that it is a false assertion. In 1974, when the standby schedule was set up, the plaintiff specifically advised Commander Rochford that he would not be merely "standing by" during the scheduled standby hours, but would in fact actually be working, and he thought it unfair to be paid only a fraction of the overtime pay he was due. He again specifically brought up the matter to CAPT James Webb, who was the plaintiff's Commanding Officer from

1978–1982. Beyond these specific meetings that were testified to, it is clear that many of the other officers in leadership positions at the Command knew of the plaintiff's actual work/standby status. For instance, CDR Donald Drake, who was the Administrative Officer at the plaintiff's Command from 1978–1982, and who testified at trial, was aware that the plaintiff, as well as several other employees on the base, was on standby pay status. He found this out in a conversation with Ms. Audrey Obermann, an employee relations specialist at the base, when checking on the overtime pay request of a club manager at the base who was also on standby schedule. When asked by the Court what he did with the knowledge obtained on plaintiff's standby status, he testified that he accepted the policy as one instituted by his predecessors and "just left it alone basically." Ts. at 374. Office of Personnel Management (OPM) regulations specifically require, however, that an agency review standby status scheduling of its employees at "appropriate intervals," and discontinue payments or revise rates of premium pay on an annual basis when necessary to meet the requirements of 5 U.S.C. § 5545(c)(1) (1976). *See* 5 C.F.R. § 550.161(f) (1970). From 1974 through 1981, the Navy violated these regulations because these "appropriate interval * * * reviews" never took place. The regulations make clear that federal agency managers that utilize standby status authority have major responsibilities to see that it is being utilized in a legally proper way and that it is not being used as a subterfuge to avoid the overtime pay statute or other premium pay statutes. Although the plaintiff has a burden to advise his Command of the problem, he fulfilled that burden. It was the defendant that failed to bear its burden and responsibilities under the law and regulations.

Although none of the Government's witnesses appeared to be aware of the OPM regulations that required "appropriate interval review," there were several "red flags" found in plaintiff's standby arrangement and status which *should* have alerted the plaintiff's Command to the need for a review. The first red flag was the fact that the plaintiff was in a management position as Director of the Special Services Division. Ms. Audrey Obermann, the Navy's personnel expert, testified at trial that standby duty status was usually utilized only for lower level workers and that it was unusual to have a management position, such as the Special Services Director position, covered by standby status. The need to schedule standby duty for the plaintiff in his management position would suggest a need for extra staffing, reduction of hours, or overtime pay.

Another red flag was the fact that on many occasions, during this 1974–1981 timeframe, the plaintiff would submit time cards to his Command that indicated he was working overtime hours beyond the 68 hours that he was scheduled for the week. When this would occur, his Command never paid him for the overtime nor called him in to question the hours worked contemporaneously with the event. It was only after he filed his overtime pay case in Federal District Court in July of 1982 that his Command reviewed his time cards, belatedly authorized the hours worked, and paid him the overtime due. Ms. Obermann had no explanation as to why this extra overtime was paid after review of his time cards several years later, but not paid for contemporaneously with the events. She testified that it *was* an unusual occurrence and again *not* according to established personnel procedures.

The entire record in this case shows a shocking laxity in procedures and a regular failure to follow established personnel guidelines and regulations at the PMTC, Point Mugu. This only strengthens the Court's conclusion that an improper standby scheduling arrangement was being used to obtain extra work from the plaintiff at a cut rate price. Commander Rochford initiated this process and subsequent supervisors either knew about the arrangement and left it alone or were unaware of this impropriety due to their own carelessness and failure to review as required by OPM regulations. In any case, the Command's

1974 scheduling of 28 regular standby hours in addition to plaintiff's regular workweek, with the knowledge that plaintiff would be actually working these hours constitutes the "order or approval" required for authorized overtime compensation for plaintiff in this case.

## CONCLUSION

For the reasons discussed herein, the Court concludes that the plaintiff is entitled to overtime pay pursuant to 5 U.S.C. § 5542(a) (1976), for those weekly 28 hours that he was scheduled for standby duty pay by his Command, with the entitlement covering the time period from July 27, 1976 to November 20, 1981. *See* USCC Rule 42(c).

The parties will have 60 days to stipulate to the amount of damages, with a status report or stipulation of damages to be filed 60 days from the date of this opinion.

Costs to the prevailing party, upon determination of the amount of recovery and the entry of judgment.